Kamathene Adonia COOPER,
Petitioner–Appellant,

v.

P. Douglas TAYLOR, Warden; T. Travis Medlock, The Attorney General of the State of South Carolina, Respondents–Appellees.

No. 93–7352.

United States Court of Appeals,
Fourth Circuit.

Argued July 13, 1995.

Decided Dec. 8, 1995.

Rehearing En Banc Granted; Opinion Vacated Jan. 26, 1996.

**ARGUED:** Bonnie Ilene Robin–Vergeer, Supervising Attorney, Appellate Litigation Program, Georgetown University Law Center, Washington, D.C., for Appellant. Donald John Zelenka, Chief Deputy Attorney General, Columbia, South Carolina, for Appellees. **ON BRIEF:** Steven H. Goldblatt, Adam C. Ciongoli, Student Counsel, Susan Curtin Gouldin, Student Counsel, Appellate Litigation Program, Georgetown University Law Center, Washington, D.C., for Appellant.

Before NIEMEYER, HAMILTON, and MOTZ, Circuit Judges.

Reversed and remanded with instructions by published opinion. Judge DIANA GRIBBON MOTZ wrote the majority opinion, in which Judge HAMILTON joined. Judge NIEMEYER wrote a dissenting opinion.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

This case involves a state court's decision to admit into evidence in a criminal trial a defendant's lengthy and detailed taped confession made without assistance of counsel, even though the defendant had twice requested counsel. After a short trial in which the prosecution heavily relied on the taped confession and the court observed that the outcome of the case "hinge[d]" on it, a jury convicted the defendant of murder and for-

gery. These convictions were sustained on direct appeal and the defendant sought and was denied post-conviction relief in state court. He then petitioned for a writ of habeas corpus. Upon consideration of the State's [1] motion for summary judgment, the magistrate judge found that the state court had erred in admitting the tape and transcript of the confession. But, in view of testimony as to two brief confessions made by the defendant prior to the full taped confession, the magistrate judge found this error harmless and so recommended that the application for habeas relief be denied. After *de novo* review, the district court accepted that recommendation and granted summary judgment in favor of the State.

The determinative issue before us is whether the state court's error in admitting the taped confession was harmless. Because, after careful consideration of the entire record, we find it "impossible to conclude" with any "fair assurance," *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), that the error in admitting the tape and transcript of this confession did not have a "substantial and injurious effect or influence" on the jury's verdict, we cannot hold this error harmless. *Id.* at 776, 66 S.Ct. at 1253; *see also O'Neal v. McAninch,* —— U.S. ——, ——, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995); *Brecht v. Abrahamson,* 507 U.S. 619, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (adopting standard set forth in *Kotteakos* ). Accordingly, we reverse and remand this case to the district court, with instructions to grant the writ of habeas corpus.

## I.

The evidence presented during the state proceedings established that Rheupert W. Stewart was found murdered in his house in Lake City, South Carolina, on Saturday, December 1, 1984. At the time of his death, Stewart was wearing a bathrobe over his shirt and slacks, and the right rear pocket of his pants had been turned out. The den, where his body was found, was in disarray

---

1. Cooper has named as respondents in this action P. Douglas Taylor, Warden of the Lieber Correctional Institution where Cooper is incar-

cerated, and T. Travis Medlock, former Attorney General of South Carolina. For ease of reference, we refer to the respondents as the State.

with pieces of a broken wooden chair scattered around his body. The autopsy revealed that Stewart had been beaten with a blunt object and stabbed with a knife in the head and chest, and that the cause of death was a knife wound to his head. After investigation, the police concluded that Stewart had been murdered sometime the previous day, November 30, 1984, but neither the crime scene nor the autopsy yielded any evidence of the identity of the murderer.

On Monday, December 3, 1984, the manager of Thomlinson's, a Lake City department store, informed the police that he had cashed a $289 check drawn on Stewart's account for Kamathene Adonia Cooper in the early afternoon of November 30. After further investigation, the police obtained a warrant to arrest Cooper for forgery. Upon learning that Cooper was at the state unemployment office in the neighboring city of Florence, police officers went there to detain him until the warrant could be served on him. An officer read Cooper his rights from a *Miranda* warning card and Cooper responded affirmatively when asked if he understood his rights. When asked if he had any questions, Cooper responded, "yes, what forgery?" Cooper said nothing else.

Shortly thereafter, Chief Brumbles, Officer Thomas McKenzie, and Officer Thomas Carey, all of the Lake City Police Department, and Agent Gerald Vause of the South Carolina Law Enforcement Division (SLED) arrived on the scene. Carey, in the presence of Vause and the other officers, served Cooper with the warrant for forgery and again read him his rights from the *Miranda* card. When Cooper was asked if he understood these rights, he stated he did not want to make any comment. The officers then drove Cooper to the Florence County Sheriff's Department, where Vause (an agent with statewide jurisdiction) re-served Cooper with the warrant and again read him his rights from a *Miranda* card, purportedly because there was concern that Carey, a Lake City officer, had lacked jurisdiction to serve the warrant in Florence. Although aware that Cooper had already invoked his right to remain silent, Vause nevertheless immediately asked Cooper if he would be willing to go to SLED

headquarters in Columbia for a polygraph test; Cooper agreed.

Vause, along with McKenzie, Brumbles, and Carey, took Cooper, in a patrol car, to the Lake City Police Department to arrange the polygraph exam and to drop off Chief Brumbles before continuing to Columbia. All of the officers except Carey went into the station. Carey remained in the back seat of the patrol car with Cooper, who was handcuffed. At that time, Alcoholic Beverage Control Agent, Phillip Grimsley, walked by the patrol car. Grimsley had just learned from Chief Brumbles that the authorities had arrested "an old acquaintance" of his, Kamathene Cooper, on a forgery charge, and that Cooper "was in back of a police car with Officer Carey." Upon seeing Grimsley, Cooper said to Carey: "There goes Phil. I would like to talk with him." Carey then motioned for Grimsley to approach the patrol car. Grimsley "spoke with Kamathene, asked him how he was doing and what was going on. He stated that they've got me for stealing a check and cashing it, but I ain't killed no man." Cooper asked Grimsley to ride with him to Columbia for the polygraph test. Grimsley said he did not think he could, but "asked [Cooper] would he like to talk before they left and he stated that he would."

With Chief Brumbles' permission, Cooper was then taken to a breathalyzer room of the police station by Carey, McKenzie, Vause, Brumbles, and Grimsley. The officers sat down with Cooper to talk, but Cooper indicated that he wished to speak to Grimsley alone and so the other officers left. Grimsley read Cooper his rights from a *Miranda* card yet again. After initially protesting that he had not "killed no man," Grimsley testified Cooper became upset, began crying, and said "I did it." After further prodding, Grimsley testified that Cooper "told [Grimsley] that he had hit Mr. Stewart three times with a chair;" and that "he had stabbed Mr. Stewart in the head and in the chest." Before Cooper made any further statement, Grimsley asked Cooper if he would be willing to talk to the other officers and provide a taped statement. Cooper agreed.

Vause, McKenzie, and Brumbles returned to the breathalyzer room with Grimsley, and Vause asked Cooper whether he understood the rights that Grimsley had read him. Cooper replied, "yes." Vause then asked Cooper to "briefly tell [him] what happened." According to Vause, Cooper "didn't go into a whole lot of detail at this time," but only said that after he had gone to Stewart's home to discuss fixing the house that he rented from Stewart, he had asked Stewart for a basketball and when Stewart leaned over to pick it up, he hit Stewart with a chair, stabbed him, took Stewart's checkbook and the knife, and threw both behind a warehouse near Lake City. Grimsley testified that he "did not hear the whole statement[ ]" and, in fact, the "only thing" he remembered hearing at this time was that Cooper said he hit Stewart "with the chair three times." McKenzie similarly testified that he "didn't hear exactly everything," but as he "recall[ed]," Cooper said he "hit Mr. Stewart with the chair" and threw the checkbook and knife behind a warehouse in Lake City.[2] After Cooper gave what the State acknowledges to be an "abbreviated statement," Brief of Respondents at 13, the officers asked him if he would be willing to go upstairs and make a taped statement. Cooper again acquiesced.

Once upstairs, McKenzie explained that the officers were going to tape Cooper's statement. The following exchange was then recorded:

McKENZIE: This is the statement of Kamathene Cooper. Today's date is 12–3–84. Time is 12:03 p.m.

All right, Kamathene, what I'm going to do is I am going to read you your rights. Do you understand that you—each of these rights you have the right to remain silent. You have the right to remain silent and if you wish to answer any questions Do you wish to—you have the right to remain silent. Anything you say can and will be used against you in a court. You have the right to talk to a lawyer and have him present during any questioning. You have—*if you cannot afford a lawyer or*

*hire a lawyer, one will be appointed to you to represent you without any questions, if you wish.* If you, if you consent to answer any questions now without a lawyer present, you still have the right to remain silent at any time. Do you wish to answer any questions that we ask you?

COOPER: Yeah.

McKENZIE: Do you understand each of these rights that I have explained to you?

COOPER: Yeah. *I can't afford no lawyer.*

McKENZIE: Do you wish to answer these questions?

COOPER: Yeah.

McKENZIE: *Do you wish to have a lawyer present?*

COOPER: *Yeah.*

McKENZIE: *You want a lawyer present?*

COOPER: *Yeah.*

McKENZIE: Do you wish to answer these questions without a lawyer?

COOPER: Yeah.

McKENZIE: Kamathene, you wish to answer these questions without your attorney present, without an attorney present?

COOPER: Yes.

(emphasis added). After this exchange, McKenzie, Vause, and Grimsley all proceeded to question Cooper about the events relating to Stewart's murder. Vause testified that nineteen-year old Cooper was "very nervous" and "very upset" when giving the taped confession and his voice "was shaking all the way through." Under the officers' continued questioning, Cooper gave an extremely detailed account of his brutal conduct in which for the first time he revealed his motive for the killing and that he had intended and planned it.

In the taped confession, Cooper said that on the morning of November 30, he had gone to Stewart's home and knocked on the door, at which time Stewart let him in. In response to the officers' questions, Cooper revealed that the purpose of his visit was to talk to Stewart about fixing the house that

---

**2.** The record does not reflect any testimony by Chief Brumbles as to any portion of this state- ment.

Cooper's family rented from him: Cooper was upset that everyone else was getting their houses "fixed" and his house "wasn't getting fixed." Cooper also confessed that he had brought a knife with him and that he did this in order "to use it against" Stewart. Under questioning, Cooper acknowledged that this meant he went to Stewart's house with the intention of "either robbing ... or hurting" Stewart. Cooper recounted that when he asked Stewart for newspapers, Stewart gave him the papers and even "went and got a bag" for Cooper to put them in. Cooper also stated that when he then asked Stewart to give him a basketball that was lying on the floor, Stewart bent down to retrieve the ball. Upon being further questioned, Cooper admitted that he had asked Stewart for the basketball so that when Stewart was stooping over to get it, Cooper could hit Stewart with a chair. While Stewart was bent over, Cooper hit him three times with the chair and then stabbed Stewart in the head.

In response to other questions, Cooper admitted in the taped confession that after he took Stewart's checkbook and searched Stewart's house and back pants pocket for valuables, he left the house, abandoning his victim even though Stewart was "still breathing a little." Cooper confessed that he then took some of the checks from the checkbook and threw the checkbook and the knife away near a Lake County warehouse. He told the officers that he had gotten some blood on his jeans and so he went home, changed pants, and then washed the jeans at the "washerette" later that night. Under further questioning, he admitted that after he had changed clothes, he went to Thomlinson's, the Lake County department store, and, between 12:30 and 1:00 p.m. on November 30, a male department store employee cashed one of the checks he had taken from Stewart. Upon request of the officers, Cooper agreed in the taped confession to take them to where he had thrown the knife and checkbook. The taped confession also included detailed descriptions of the clothing that Stewart had been wearing, the layout and contents of Stewart's house, what Cooper had touched in the house, the number of checks Cooper had taken from Stewart's checkbook (about six),

and the precise location of the warehouse where Cooper had discarded the knife and checkbook. After Cooper made the taped confession, Cooper guided the officers to the warehouse; subsequently, they were able to recover the checkbook, but not the knife, in the vicinity of that warehouse.

McKenzie arranged for the taped confession to be transcribed. The next day, he brought the resulting transcript to Cooper in his holding cell and Cooper signed it. At that time, McKenzie also obtained handwriting exemplars from Cooper, which established that Cooper had written the check cashed at the department store.

On December 9, 1987, the state trial court conducted a hearing pursuant to *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), to determine if any of Cooper's statements should be excluded because they were involuntary or otherwise taken in violation of his constitutional rights as set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In addition to the officers' testimony, two expert witnesses, Dr. Geoffrey McKee and Dr. Donald Morgan, testified at the evidentiary hearing on behalf of the defense. Drs. McKee and Morgan also reiterated their testimony at trial.

Dr. McKee, a senior forensic psychologist, testified that Cooper had a "full scale I.Q. of 78." Dr. McKee explained that this was "in the borderline intellectual functioning range representing approximately the lower sixth to seventh percentile." Moreover, according to Dr. McKee, Cooper tested even worse in vocabulary, comprehension, and abstract reasoning ability skills. Dr. McKee testified that Cooper's capacity for abstract reasoning would have been further impaired by the stressful situation which he was in at the time of his arrest. Finally, Dr. McKee opined that, although Cooper at the time of testing (October 1987) seemed to understand his *Miranda* rights, in view of Cooper's "limited intellect," the "very stressful situation," and his affirmative answers to contradictory questions during the taped confession, the doctor had "doubt about [Cooper's] capacity

to fully understand and waive his *Miranda* rights" three years earlier at the time of the crime. Dr. Donald Morgan, a Professor of Psychiatry at the University of South Carolina School of Medicine, testified that he had examined Cooper on two occasions. Based on his conversations with Cooper, the testimony he heard at the suppression hearing, and the taped confession, he opined that Cooper was "very distraught and nervous and upset" during the interrogation. Dr. Morgan also concluded that Cooper's borderline intellectual capacity made him particularly susceptible to the stress of his arrest and that Cooper's "capacity to perform any judgment at that time was marketably [sic] impaired."

The state trial judge denied the motion to suppress. His ruling in its entirety was as follows:

> All right. Your motion to suppress any statements to be offered which I have been advised during this hearing and the handwriting exemplar are denied.
>
> I find as a fact and beyond a reasonable doubt that the defendant was warned prior to any questioning. That he had the right to remain silent. That anything he said could be used against him in a court of law. That he had the right to the presence of an attorney and if he couldn't afford one, one would be appointed for him. And that after such warnings were given, I'm of the opinion that the defendant fully understood those rights and that he knowingly and intelligently waived them and agreed to answer the questions or make a statement.
>
> Now, in making this ruling, I have considered that there was no physical or psychological pressure. He was not worn down by any improper interrogation tactics or any lengthy questions. There was no trickery or deceit and there was [sic] no threats or intimidation or coercion, but that the statement was made and taped on one day and thereafter transcribed and submitted to the defendant[;] and the officer's testimony is undisputed that the defendant voluntarily signed it after having been given the opportunity to read it[;] and I have likewise considered all of the circumstances using "the totality of the circumstances."
>
> I am of the opinion that it is admissible.

Over timely objections at trial, Cooper's taped confession was played in full for the jury, and the jury was provided with a typed and signed copy of the confession to read as the tape was played. The taped confession consumed nineteen pages of the trial transcript, and as the trial court recognized, the outcome of the day and a half trial "hinge[d]" on the taped confession. It was repeatedly relied on by the prosecution; indeed, the prosecution referred to the taped confession more than fifteen times in a closing argument that covers only twenty transcript pages. In addition, the tape and signed copy of the taped confession were provided to the jury during its deliberations. The jury subsequently convicted Cooper[3]—who presented no defense—of murder and forgery and acquitted him of armed robbery. The judge sentenced him to life in prison, plus seven years for forgery.

Cooper appealed his convictions and sentences to the Supreme Court of South Carolina, asserting, *inter alia,* that the admission of the taped confession after he had "requested but was not afforded counsel" violated his rights under the Sixth and Fourteenth Amendments. The Court affirmed the convictions and sentences. Cooper proceeded to apply for post-conviction relief in state court, which was denied.

Cooper then filed this petition—his first—pursuant to 28 U.S.C. § 2254. Cooper claimed, *inter alia,* that he "asked for an attorney each and every time he was given his *Miranda* rights," that the court "committed reversible error when it decided to admit evidence that was illegally taken by the police officers," and that his "[c]onviction [was] obtained by use of [a] coerced confession" and in violation of his right "to have counsel

---

**3.** These convictions were the result of Cooper's second trial. He had been previously tried and convicted of murder, armed robbery, and forgery; the Supreme Court of South Carolina reversed these convictions because of multiple errors, none of which is applicable here. *See State v. Cooper,* 291 S.C. 332, 353 S.E.2d 441 (1986), *overruled on other grounds by State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315, 329 (1991).

present during interrogation." On consideration of the State's motion for summary judgment, the magistrate judge found that "[a]s to the taped statement, the record is clear that the petitioner invoked his right to counsel," that "the taped confession was made in violation of the petitioner's right to counsel" under *Edwards,* and that its admission into evidence was error. However, the magistrate judge concluded that this error was nonetheless harmless because the jury heard evidence that Cooper forged one of Stewart's checks and because the taped statement was "cumulative to the two oral confessions," which had been properly admitted. For this reason, the magistrate judge recommended denial of habeas relief.

Cooper timely filed *pro se* objections to the magistrate judge's recommendations; the State filed no objections. After *de novo* consideration, the district court concurred with the magistrate judge's assessment that the taped statement was unlawfully obtained, holding that "[t]here is no question but that the taped confession was taken after Petitioner clearly asserted his right to counsel. Petitioner responded affirmatively when asked if he wanted a lawyer present, nonetheless the police continued questioning him. The statement should not have been admitted." However, the district court also deemed the error harmless because "all other evidence was properly admitted" and "the statement alone had no substantial influence on the jury's verdict." Cooper noted an appeal and this court issued a certificate of probable cause.

## II.

■ Before us Cooper asserts both that admission of the taped confession in violation of *Edwards* was not harmless and that his two prior statements were obtained in violation of his "Fifth Amendment right to remain silent." We do not reach the latter argument

because of our resolution of the former. The dispositive issue in this case is thus whether the admission into evidence of the taped confession, although error under *Edwards,* is nevertheless harmless.[4]

*Edwards* established that "if a suspect requests counsel at any time during [an] interview [by law enforcement officials], he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States,* —— U.S. ——, ——, 114 S.Ct. 2350, 2354–55, 129 L.Ed.2d 362 (1994). The *Edwards* holding was mandated by the Fifth Amendment right protected in *Miranda* "to have counsel present at any custodial interrogation." *Edwards,* 451 U.S. at 485, 101 S.Ct. at 1885. It "sets forth a 'bright-line rule' that *all* questioning must cease after an accused requests counsel." *Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984) (quoting *Solem v. Stumes,* 465 U.S. 638, 646, 104 S.Ct. 1338, 1343, 79 L.Ed.2d 579 (1984)) (emphasis in *Smith* ). The Supreme Court has "repeatedly emphasized" that *Edwards* is a " 'prophylactic rule, designed to protect an accused in police custody from being badgered by police officers....' " *Smith,* 469 U.S. at 95 n. 2, 105 S.Ct. at 492 n. 2 (quoting *Oregon v. Bradshaw,* 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983)). Accordingly, the clarity and importance of the *Edwards* rule is unquestioned. Nonetheless, evidence admitted in violation of the *Edwards* rule is trial, rather than structural, error. *See Arizona v. Fulminante,* 499 U.S. 279, 306–10, 111 S.Ct. 1246, 1263–65, 113 L.Ed.2d 302 (1991) (discussing distinction). For this reason, *Edwards* error can be harmless. *Id.* at 306–07, 111 S.Ct. at 1263 (although structural errors—*e.g.,* a biased judge—"automatically require reversal," constitutional trial errors can be harmless). The question of whether an error is harmless is a

4. Recognizing, as it must, that the magistrate judge expressly found that admission of the taped confession was error under *Edwards,* and that it failed to file any objections to that or any of the magistrate judge's recommended findings, the State has conceded that it has waived any claim that admission of the taped confession was proper. *See* Brief of Respondents at 25; Tape of Oral Argument (July 13, 1995); *see generally Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. George,* 971 F.2d 1113, 1118 n. 7 (4th Cir.1992) ("[a] party waives the right to appellate review of a magistrate's decision if it fails to object to the proposed decision before the district court").

mixed question of law and fact and a habeas court's review of that question is *de novo. Bonner v. Holt,* 26 F.3d 1081, 1083 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1328, 131 L.Ed.2d 207 (1995); *Suniga v. Bunnell,* 998 F.2d 664, 667 (9th Cir.1993); *see also Brecht,* 507 U.S. at ——, 113 S.Ct. at 1722 (reviewing *de novo* the "record as a whole" under *Kotteakos* ).

■ The standard to be applied in determining whether trial error—including *Edwards* error—is harmless in federal habeas corpus cases was established in *Brecht* and clarified in *O'Neal. See Smith v. Dixon,* 14 F.3d 956, 974–75 (4th Cir.) (*en banc* ), *cert. denied,* —— U.S. ——, 115 S.Ct. 129, 130 L.Ed.2d 72 (1994). Prior to *Brecht,* the same harmless error rule applied in direct appeals and in federal habeas corpus cases. Pursuant to that rule, which was set forth in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), convictions tainted by a constitutional trial error could be upheld only if the prosecution demonstrated "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." The *Brecht* Court held that the *Chapman* standard, although still applicable to errors reviewed on direct appeal, was no longer to be used in federal habeas corpus review. Instead, the Court adopted a new standard for constitutional trial errors reviewed in federal habeas corpus cases, requiring reversal only if an error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht,* 507 U.S. at ——, 113 S.Ct. at 1714 (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253);[5] *see also Smith,* 14 F.3d at 975.

■ Obviously, the *Brecht–Kotteakos* standard is "less onerous" than the *Chapman* standard. *Brecht,* 507 U.S. at ——, 113 S.Ct. at 1722. However, since it is after all a standard to be used in reviewing a criminal conviction, it is not toothless. *See Brecht,* 507 U.S. at ——, 113 S.Ct. at 1723 (Stevens, J., concurring) ("the standard is appropriately demanding"). Indeed, as the Supreme Court has explained, it is only when a judge

is " 'sure that the error did not influence the jury, or had but very slight effect' " that an error is harmless under this standard. *O'Neal,* —— U.S. at ——, 115 S.Ct. at 995 (quoting *Kotteakos,* 328 U.S. at 764, 66 S.Ct. at 1248). Thus, if " 'one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.' " *Id.* Accordingly, we have not hesitated to conclude that error was not harmless under the *Kotteakos* standard. *See, e.g., United States v. Madden,* 38 F.3d 747, 753 (4th Cir.1994); *United States v. Ince,* 21 F.3d 576, 585 (4th Cir.1994); *United States v. Sanders,* 964 F.2d 295, 299–300 (4th Cir.1992); *United States v. Taylor,* 900 F.2d 779, 783 (4th Cir.1990).

Perhaps recognizing that the *Kotteakos* standard is, indeed, "demanding," *Brecht,* 507 U.S. at ——, 113 S.Ct. at 1723 (Stevens, J., concurring), the Chief Justice in *Brecht* sought to make the state's task easier in habeas cases by suggesting that habeas petitioners carried the burden of proof. Thus, for the five-member majority, the Chief Justice asserted that petitioners were "not entitled to habeas relief based on trial error unless *they [could] establish* that it resulted in *'actual prejudice.'* " 507 U.S. at ——, 113 S.Ct. at 1722 (emphasis added). However, Justice Stevens, whose vote was necessary to make up the *Kotteakos* majority pointedly disagreed with this assessment as to burden, noting that "*Kotteakos* plainly stated that unless an error is merely 'technical,' the burden of sustaining a verdict by demonstrating that the error was harmless *rests on the prosecution.*" 507 U.S. at ——, 113 S.Ct. at 1723 (Stevens, J., concurring) (emphasis added). This difference in approach is most important in the close case because there, under the Chief Justice's formulation, since the habeas petitioner has the burden of proof, the state would prevail, while, if as Justice Stevens asserted, the burden re-

---

5. The *Kotteakos* standard, like Fed.R.Crim.P. 52(a) (any "error, defect, irregularity or variance which does not affect substantial rights shall be disregarded"), is derived from the harmless error statute, 28 U.S.C. § 2111.

mained on the prosecution, the petitioner would prevail.

In its recent decision in *O'Neal,* the Supreme Court clarified the proper application of the *Brecht–Kotteakos* standard. The *O'Neal* Court eschewed a burden of proof analysis, explaining:

> The case before us does not involve a judge who shifts a "burden" to help control the presentation of evidence at trial, but rather involves judges who apply a legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect. In such a case, we think it is conceptually clearer for the judge to ask directly, "Do I, the judge, think that the error substantially influenced the jury's decision?" than for the judge to try to put the same question in terms of proof burdens....

—— U.S. at ——, 115 S.Ct. at 995. The Court, however, expressly held that in a close case, where "the conscientious judge [is] in grave doubt about the likely effect of an error on the jury's verdict," the habeas petitioner "must win." —— U.S. at ——, 115 S.Ct. at 994. Thus, when "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error" the judge "should treat the error, not as if it were harmless, but as if it affected the verdict (*i.e.,* as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." *Id.* (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253).

▇ Moreover, in determining whether error is harmless under *Kotteakos,* the question is not whether the jury was correct in its judgment as to guilt or innocence. *Kotteakos,* 328 U.S. at 764, 66 S.Ct. at 1247–48; *see also Brecht,* 507 U.S. at ——, 113 S.Ct. at

1724 (Stevens, J., concurring). Rather, the question is:

> ... what effect the error had or reasonably may be taken to have had upon the jury's decision. *The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.*
>
> This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason. This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record.

*Kotteakos,* 328 U.S. at 764, 66 S.Ct. at 1247–48. (emphasis added).[6]

▇ The primary factors to which courts look in determining the "impact of the thing done wrong ... in the total setting" are: (1) whether the case was tried by a court, *Pemberton v. Collins,* 991 F.2d 1218, 1226–27 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 637, 126 L.Ed.2d 596 (1993), or, if tried to a jury, whether steps were taken by the court to mitigate the error, *Ince,* 21 F.3d at 583; (2) whether the evidence was a confession, *Fulminante,* 499 U.S. at 296, 111 S.Ct. at 1257–58, or otherwise infected an issue central to the case, *Ince,* 21 F.3d at 583; (3) whether the evidence was heavily relied on by the prosecution, *Brecht,* 507 U.S. at ——, 113 S.Ct. at 1722; and (4) whether the evidence was part of a case in which the evidence, taken as a whole, was sufficiently "weighty," *id.,* or whether the case was too close to give a "fair assurance that the [tainted] evidence did not substantially sway the jury to its verdict." *Ince,* 21 F.3d at 585 (internal quotations omitted). Careful consideration of these fac-

---

6. Thus, our dissenting colleague misses the mark when he opines that in his view affirmance is required because he is "convinced beyond doubt that the jury in this case would have convicted Cooper without his third confession." Dissent at 1472. This is simply not the relevant inquiry. Rather, like the Supreme Court, this court has repeatedly recognized that, in applying the *Kotteakos* test, we must be mindful that "it does not ask whether we believe that irrespective of the

error there was sufficient evidence to convict, but whether ... we believe it 'highly probable that the error did not affect the judgment.'" *United States v. Nyman,* 649 F.2d 208, 212 (4th Cir.1980) (quoting Roger J. Traynor, The Riddle of Harmless Error, 34–35 (1970)); *accord Ince,* 21 F.3d at 583 (collecting cases in which this "longstanding interpretation" has been followed).

tors convinces us that it is " 'impossible to conclude' " with any " 'fair assurance' " that the error in admitting the taped confession did not have a "substantial and injurious effect or influence" on the jury's verdict. *O'Neal,* —— U.S. at ——, ——, 115 S.Ct. at 995, 997 (quoting *Kotteakos,* 328 U.S. at 764, 776, 66 S.Ct. at 1247–48, 1253).

As to the first factor, we simply note that we cannot conclude that the trier of fact was able to disregard the error in admitting the taped confession and find Cooper guilty despite it because this case was tried before a jury and guilt was determined by people not experienced in the law.[7] *Cf. Pemberton,* 991 F.2d at 1226–27. Moreover, no steps whatsoever were taken to mitigate the error in this case. *Cf. Ince,* 21 F.3d at 583. Of course, as we explained last year in *Ince,* "[e]vidence of a confession can have such a devastating and pervasive effect that mitigating steps, no matter how quickly and ably taken, cannot salvage a fair trial for the defendant." 21 F.3d at 583.

This brings us to the second factor. The record is clear that not only did the error infect an issue central to the case—the identity and state of mind of the perpetrator of the crime—it resulted in admission of the most devastating sort of evidence, a full confession by the defendant. The Supreme Court explained in *Fulminante* why a defendant's own confession is singularly persuasive and damning evidence:

> A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.

Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so. While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision.

499 U.S. at 296, 111 S.Ct. at 1257 (internal quotations and citations omitted). A full confession may have such an "indelible impact" on the jury that "it doubtless will be tempted to rest its decision on that evidence alone." *Id.* at 313, 111 S.Ct. at 1266 (Kennedy, J., concurring in the judgment).[8]

Recognizing the decisive impact of a confession, the *Fulminante* Court held that the error in admitting an initial improper confession was not harmless even though it was followed by a full, properly admitted, confession, 499 U.S. at 295–302, 111 S.Ct. at 1257–61, which gave "more details of the crime" than the improperly admitted confession. *Id.* at 312, 111 S.Ct. at 1266 (Rehnquist, C.J., dissenting). In *Fulminante,* the state argued, as it does here, that the admission of the inadmissible confession was harmless because it was (1) cumulative to a subsequent confession and (2) corroborated by independent evidence. *See id.* at 296–97, 111 S.Ct. at 1257–58. The Supreme Court specifically rejected both arguments. First, the Court pointed out that the inadmissible confession could not be cumulative, even though the admissible confession was more detailed, because "the jury's assessment of the [admissible] confession . . . could easily have depend-

---

7. We are not presented with the question of whether a jury would have been able to disregard the taped confession if the trial judge had ultimately determined that its admission had been error and so instructed the jury. In the present case the trial judge did not so rule nor did he even instruct the jury that it should not consider any statements taken after Cooper had requested counsel. Instead, the judge only instructed the jury not to consider statements that were "not the free and voluntary willed expression of the defendant."

8. Even those justices dissenting from the holding in *Fulminante* noted the devastating impact of a confession:

> Of course an involuntary confession may have a more dramatic effect on the course of a trial than do other trial errors—in particular cases it may be devastating to a defendant—but this simply means that a reviewing court will conclude in such a case that its admission was not harmless error. . . .

*Id.* at 312, 111 S.Ct. at 1266 (Rehnquist, C.J., dissenting).

ed in large part on the presence of the [inadmissible] confession...." *Id.* at 298, 111 S.Ct. at 1258. The Court then noted that although the admissible confession was corroborated in some respects, "other aspects" of it, "including [the defendant's] motive and state of mind," were only corroborated by the admissible confession. *Id.* at 299, 111 S.Ct. at 1259. Furthermore, the fact that the inadmissible confession "led to the admission of other evidence prejudicial to [the defendant]" was an additional reason why its admission could not be harmless. *Id.* at 300, 111 S.Ct. at 1259–60.

*Fulminante* was decided under the *Chapman* standard, but in the case at hand, the State has not even suggested that *Fulminante* would be decided differently under the *O'Neal–Brecht–Kotteakos* standard. Rather, the State implicitly concedes *Fulminante* is controlling and seeks to distinguish it. That effort is unavailing. Indeed, the facts supporting a finding of harm in this case are more compelling than in *Fulminante*. There the inadmissible confession was followed by an admissible confession that was more detailed and complete than the inadmissible one. *Fulminante*, 499 U.S. at 312, 111 S.Ct. at 1266 (Rehnquist, C.J., dissenting). Here, the inadmissible confession was far and away the defendant's most comprehensive confession; it was preceded only by much briefer, less precise statements. Moreover, the inadmissible confession here was also the only taped confession. Thus, improperly admitting it into evidence permitted the jury to hear Cooper *in his own voice* confess to one brutal, malicious act after another. Just as the Supreme Court concluded that the *Fulminante* jury's assessment of the admissible confession "could have easily depended," *id.* at 298, 111 S.Ct. at 1258–59, on the presence of the inadmissible confession, we are compelled to conclude that the *Cooper* jury's assessment of testimony as to the prior abbreviated confessions likely depended on the presence of the later inadmissible taped confession.

Moreover, while in *Fulminante* the improperly admitted confession contained the only evidence *corroborating* the properly admitted confession as to the defendant's motive and state of mind, here the improperly admitted taped confession contained the *only* evidence of the defendant's motive and state of mind. There is no physical evidence nor is there anything in the testimony as to the earlier abbreviated confessions explaining why Cooper wanted to kill Stewart, or even whether Cooper intended to commit murder. It was not until Cooper was pressed by law enforcement officers during the taped confession that he admitted that, because he was upset Stewart had not fixed his house, he brought a knife with him, intending either to rob or hurt Stewart. Furthermore, in *Fulminante*, the additional prejudicial evidence obtained because of the inadmissible confession—evidence as to the ties to organized crime of the defendant's confederate—was somewhat tangential. Here, the additional prejudicial evidence obtained because of the inadmissible taped confession—the stolen checkbook—was not only direct evidence of another crime, but also arguably placed Cooper at the murder scene. Thus, this case contains even more compelling evidence of harm than *Fulminante*.[9]

The third factor critical to determining whether the verdict actually rendered was

---

9. Of course, there are cases in which the erroneous admission of a confession has been held harmless, but they have involved an invalid confession, which is innocuous or cryptic, or accompanied by other detailed and complete valid confessions, or part of a case in which there is other, overwhelming evidence of guilt, like eyewitness testimony. For example, in *Milton v. Wainwright*, 407 U.S. 371, 377–78, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1 (1972), the admission of an invalid confession was held harmless in view of the fact that the defendant made three other valid full confessions. One of the admissible confessions was taped and the others were made before a stenographer, transcribed, and voluntarily signed by the defendant. In *Correll v. Thompson*, 63 F.3d 1279, 1291–92 (4th Cir. 1995), the admission of an arguably invalid confession was held harmless because guilt was established by "overwhelming" other evidence including eyewitness testimony and testimony from two other witnesses as to the defendant's detailed confessions to them. Moreover, in *Correll*, because the challenged confession was admitted, other prejudicial evidence was not admitted; this is in marked contrast to the case at hand where the inadmissible confession led not to *eliminating* other evidence helpful to the prosecution but to the *admission* of other evidence helpful to it. *See infra.*

attributable to the error—*i.e.*, the extent to which the prosecution relied on the erroneously admitted evidence—also strongly suggests that the error here cannot be judged harmless. In *Brecht*, the very first thing noted by the Court in concluding that the error was harmless was that the prosecution had *not* relied on the error: "The state's references to petitioner's post-*Miranda* silence were infrequent, comprising less than two pages of the 900-page trial transcript...." *Brecht*, 507 U.S. at ——, 113 S.Ct. at 1722. Similarly, this factor was extremely significant in *Fulminante*. *See* 499 U.S. at 297-98, 111 S.Ct. at 1258-59. There, the prosecution's reliance on the invalid confession in its opening statement and closing argument and the trial court's recognition that it was "the centerpiece" of the case "compel[led]" the Supreme Court to conclude that admission of the invalid confession was not harmless. *Id.* at 297, 111 S.Ct. at 1258; *see also Collazo v. Estelle*, 940 F.2d 411, 424-26 (9th Cir.1991), *cert. denied*, 502 U.S. 1031, 112 S.Ct. 870, 116 L.Ed.2d 776 (1992).[10]

As in *Fulminante*, here the trial court recognized that, because of the State's heavy reliance on the taped confession, a successful prosecution depended on the jury believing the inadmissible confession. In denying Cooper's motion for directed verdict, the trial court stated:

> ... of course, *the case hinges and will stand or fall upon the alleged confession.* And I have previously denied your motion to suppress that evidence. And in furtherance of that motion, of course, there was at least a day that elapsed after the making of the statement on the tape and then the typing it up and then giving it back to him. He had an opportunity to read it and refuse to sign it and deny it if he had so

desired and I think those are questions of fact for the jury, sir, and I would deny your motion.

(emphasis added). Thus, the trial court, which heard all of the evidence in the case and was in a far better position than we to judge its impact, was absolutely clear that the taped confession alone—*not in conjunction with* the brief earlier statements—would be determinative of the jury's verdict.[11] The trial court concluded that the inadmissible taped confession was not just "the centerpiece" of the State's case, as in *Fulminante*, 499 U.S. at 297, 111 S.Ct. at 1258, but that the State's case "hinge[d]" and would "stand or fall" on it.

There is no question that the trial court's assessment was borne out by the prosecution's closing argument. That relatively short argument—twenty transcript pages—is literally saturated with references to the taped confession. We pick just three examples. First, the prosecution explained to the jury that it did not need to rely on implied malice because "out of Cooper's mouth" jurors had heard evidence of "real, hard, actual real world malice":

> ... you look at the facts of this case and when *you hear Mr. Cooper's own voice* telling you that he took that kitchen knife with him thinking he would use it against Mr. Stewart to rob him or kill him. When *he tells you in his own voice and signs a statement* a day later saying after he had given me the newspapers, I got him to turn around and reach for the basketball so his back would be to him so I could clobber him with the chair.

> There you see, not only what the law calls implied malice, because when you use a deadly weapon like a knife against some-

---

10. Unlike the Supreme Court, we have not before today specifically pointed to the prosecution's reliance on erroneously admitted evidence as a factor to be considered in determining whether the error was harmless. We have, however, often recognized that repeated references in the prosecution's closing argument to erroneously admitted evidence increases the prejudicial effect of the error on the defendant. *See, e.g., Madden*, 38 F.3d at 753-54; *Taylor*, 900 F.2d at 781.

11. The State's argument that "references by the trial judge to the conclusion that the case hinged on the confession was [sic] not limited to the one [taped] confession ... but [to t]he concept of Cooper's confessions generally" is simply not borne out by the record. The trial court spoke of "the alleged confession," in the singular. Moreover, it referred to this "statement," again in the singular, as made on "tape," then "typ[ed] up" and given to Cooper to "read" and "sign". Only one confession—the taped confession—was taped, typed, read and signed.

body, that's a fact you can use to infer malice, evil intent. But when *you hear out of the words of somebody's mouth, this is the way I did it. I took it ahead of time. Well, I didn't know if I was going to kill him, but as I sat there, I just decided to do it. I formulated a plan. I got him to turn around. I made sure it was done. That's real, hard, actual real world malice.*

(emphasis added). Second, the prosecution pointed out that the jury had, by "listening" to what Cooper had "said," learned his motive for murder:

Now, the law does not require us to prove motive. But you can look at facts and *you can listen to what he said and you see motive there.* What is the first thing this man, Kamathene Cooper did after he had rendered this man senseless and sent him towards his inevitable death?

He went through his pockets. He went through his pockets. *And you will recall on his statement from reading along and listening.* I looked, but I didn't find anything. *And he said* I went in other rooms, but I didn't find anything. And, of course, you see the evidence that he went through Mr. Cooper's (sic) pocket. You see the evidence as corroborated in his statement that he did, in fact, go in that room where the stereo was and pull to one side that curtain not realizing what was there.

(emphasis added). Third, the prosecution concluded its argument with numerous rhetorical questions based on what Cooper "said" or "told" the jury:

*Did he not say* in the statement that he had the gentleman to bend over in the corner to look for a basketball? Is this not the basketball? *Did he not say* that he hit the man with a chair? Do we not have the chair? *Did he not say* that he was admitted into the house without having a break-in and Mr. Gravely not tell you that there was no sign of forcible entry[?]

*Did he not tell you* that he stabbed the man with a knife? And did Dr. Conradi not tell you that the man had a stab wound to the head that penetrated his brain? *Did he not tell* you that he stole a checkbook? And do we not have the stolen checkbook? Did he not take the officers to

where the checkbook was and are there not photographs of him being there? *Did he not say* I took about six checks out? And are there not but about five or six checks missing? *Did he not say* that he went to Thomlinson's? And did Mr. King not verify that he had been at Thomlinson's? Point after point after point after point after point.

(emphasis added).

In sum, it is hard to envision a case in which erroneously admitted evidence was more heavily relied on by the prosecution. Moreover, the prosecution's repeated reference to the taped confession in closing argument clearly impressed on the jury that the State regarded this evidence as crucial to obtaining a conviction. *See United States v. Ruffin,* 575 F.2d 346, 360 (2d Cir.1978) (erroneously admitted evidence "must have been in the forefront of the jurors' minds when they retired to deliberate" in light of "the extent to which the prosecutor dwelt upon that particular [evidence] during both his opening summation and his rebuttal"). Thus, the state trial court's assessment that the case "hinge[d]" on the taped confession was certainly an accurate description of the prosecution's emphasis and strategy. Tellingly, when considering the harmlessness *vel non* of the taped confession's admission, the magistrate judge and district court did not have the benefit of the transcript of the state trial proceedings or any other indication that the State's case "hinge[d]" on the taped confession.

The final factor to be examined in determining whether the verdict "actually rendered" was attributable to error—*i.e.,* the closeness of the case—also indicates that the error here cannot be regarded as harmless. The only evidence, apart from the taped confession and evidence made relevant because of it, connecting Cooper to Stewart's murder are the two prior abbreviated statements and the department store employee's testimony that Cooper presented Stewart's check for payment on the day Stewart died. The latter testimony, while it provides independent evidence of forgery and, arguably, places Cooper at the scene of the killing, does not directly tie Cooper to the murder. No physi-

cal evidence—fingerprints, footprints, matching blood samples, etc.—linked Cooper to the murder. *Cf. Brecht,* 507 U.S. at ——, 113 S.Ct. at 1722.[12] No eyewitness saw him enter or leave Stewart's house. *Cf. Correll,* 63 F.3d at 1291. No witness testified to any disagreements between Cooper and his victim or any motive Cooper might have had for the murder. *Cf. Brecht,* 507 U.S. at ——, 113 S.Ct. at 1722; *Correll,* 63 F.3d at 1291. There was no evidence, except for the taped confession, that Cooper had planned to kill Stewart. *Cf. id.* Indeed, there was expert testimony from which a jury might infer that, with his borderline intelligence, this was impossible. Thus, without the taped confession, the evidence against Cooper on the murder charge was not "weighty," as in *Brecht,* 507 U.S. at ——, 113 S.Ct. at 1722, let alone "overwhelming," as in *Correll,* 63 F.3d at 1291–92.

To be sure, without the taped confession, there was probably sufficient evidence to convict Cooper. But in determining whether the error in admitting the taped confession was harmless, the question is *not* whether the jury was correct in its judgment as to guilt or innocence. *Kotteakos,* 328 U.S. at 764, 66 S.Ct. at 1247–48. The "closeness" inquiry, as we have repeatedly recognized, "is not 'for the purpose of determining whether, if *independently considered,* [the other] evidence would have sufficed to convict.'" *Ince,* 21 F.3d at 584 (quoting *Urbanik,* 801 F.2d at 699) (emphasis added). Rather, the inquiry into the closeness of the evidence requires consideration of whether the other evidence "is sufficiently powerful *in relation to* the tainted evidence to give fair assurance that the tainted evidence did not substantially sway the jury to its verdict." *Id.* (internal quotations omitted) (emphasis added). Thus, the focus must be on the "impact of the thing done wrong on the minds" of the jurors "in the total setting."

*Kotteakos,* 328 U.S. at 764, 66 S.Ct. at 1247–48.

Here the "impact of the thing done wrong" on the jurors seems undeniable. This day and a half trial "hinge[d]" on the "thing done wrong" (the inadmissible taped confession) and evidence which became relevant because of it. Thus, without the taped confession not only would the most powerful evidence against Cooper have been eliminated, but much of the other evidence against him would not have been available or would have been irrelevant. Only in the taped confession did Cooper agree to take the police to the place where he discarded the checkbook and so the checkbook, a valuable piece of corroborative evidence, was recovered solely as a result of the taped confession. In addition, the taped confession made otherwise insignificant evidence meaningful—*e.g.,* the bag of newspapers, the fact that Cooper's pants pocket was turned inside out, the arrangement of furniture in the victim's house, the fact that there was no break-in, the time when Cooper cashed the check—all of which was revealed in testimony during the prosecution's case and then skillfully used in its closing argument. Without the taped confession, all such evidence was meaningless, but with the taped confession, this evidence became highly relevant and corroborative of guilt.

Moreover, the admission of the taped confession virtually eliminated all possible defenses. Without the taped confession, there was only the officers' testimony as to Cooper's brief earlier confessions; Cooper could have demonstrated that their recollection was vague and their testimony imprecise.[13] Similarly, if the taped confession had not been admitted, Cooper could have pointed out the lack of detail and the arguable lack of probative value in the abbreviated statements—*e.g.,* in those two earlier statements

---

**12.** The lack of any physical evidence tying Cooper to the crimes was another fact unknown to the magistrate judge and district court when they considered the question of whether the error was harmless.

**13.** Only Grimsley could testify as to the first very brief confession. Three officers testified as to the second, but neither Grimsley nor McKenzie

heard all of it—Grimsley only remembered Cooper saying he hit his victim "with the chair three times" and McKenzie only remembered Cooper saying "he had killed Mr. Stewart." Even Vause, who gave the fullest account of the second statement, conceded that Cooper "didn't go into a whole lot of detail."

there was no evidence of murderous motive, plan, or intent.

Furthermore, admission of the taped confession had a devastating impact on Cooper's ability to mount his best defense, *i.e.*, that the other two statements were not voluntarily obtained. The state trial judge made an initial determination that all three confessions were voluntarily given and so were admissible at trial. The final decision as to whether any of Cooper's statements were freely and voluntarily given was, however, left to the jury. There was expert testimony at trial that Cooper did not, in fact, understand his rights and so did not effectively waive them. All of the confessions were relevant to the jury's decision as to whether Cooper understood his *Miranda* rights—an important factor for the jury to consider under the "totality of the circumstances" test. *See, e.g., State v. Davis*, 309 S.C. 326, 422 S.E.2d 133, 144 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2355, 124 L.Ed.2d 263 (1993). But Cooper's taped confession is clearly the most probative evidence the jury considered on this point. Unlike the prior brief statements, which were related only by the testimony of the officers to whom they were given, the taped confession allowed the jurors to hear Cooper, in his own voice, acknowledge his *Miranda* rights, and recount the crimes in grim detail. The taped confession was, absent the *Edwards* problem, apparently voluntary and so powerful that it eliminated any argument that the prior statements were not similarly voluntary. Thus, without the taped confession, determination of the voluntariness of the prior two confessions was a far closer question for the jury's consideration.

■■■ Thus, erroneously admitting the taped confession severely impaired Cooper's only possible defenses. When error "precludes or impairs presentation of an accused's sole means of defense" a court should be "particularly reluctant to deem [the] error harmless...." *United States v. Harris*, 733 F.2d 994, 1005 (2d Cir.1984) (applying *Kotteakos* standard to find error not harmless) (internal quotation and citations omitted); *accord United States v. Peak*, 856 F.2d 825, 835–36 (7th Cir.1988) (same), *cert. denied*,

488 U.S. 969, 109 S.Ct. 499, 102 L.Ed.2d 535 (1988); *see also, Owen v. Alabama*, 849 F.2d 536, 540 (11th Cir.1988) (erroneous admission of a confession not cumulative of other confessions or harmless under *Chapman* because it revealed intent to kill and so "impacted 'upon the conduct of the defense' ").

In sum, as in *Ince* and *Urbanik*, the other evidence in the case is not "sufficiently powerful in relation to the tainted evidence to give 'fair assurance' that the tainted evidence did not 'substantially sway' the jury to its verdict." *Urbanik*, 801 F.2d at 699 (quoting *Kotteakos*, 328 U.S. at 765, 66 S.Ct. at 1248); *accord Ince*, 21 F.3d at 584. A recording of a defendant confessing to murder at length in his own voice, and in doing so, providing the only evidence of murderous motive, plan, and intent would in all likelihood "tempt" any jury "to rely upon that evidence alone in reaching its decision," *Fulminante*, 499 U.S. at 296, 111 S.Ct. at 1248, "without careful consideration of the other evidence in the case." *Id.* at 313, 111 S.Ct. at 1266 (Kennedy, J., concurring in the judgment); *see also Ince*, 21 F.3d at 585. When this full taped confession is viewed in the context of the proceedings of this case, this temptation seems nearly irresistible. The prosecution repeatedly and vociferously relied on the taped confession, giving it clear primacy over any other evidence. As the trial judge expressly recognized, the State's case "hinge[d]" on and "st[oo]d or f[e]ll upon the alleged confession." In light of this emphasis on the taped confession, which in its very nature is "devastating," *Fulminante*, 499 U.S. at 312, 111 S.Ct. at 1266 (Rehnquist, C.J., dissenting), we cannot conclude with any "fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos*, 328 U.S. at 765, 66 S.Ct. at 1248.

### III.

■■■ Our holding here, directing that a writ of habeas corpus be granted, disturbs a final state judgment and requires a retrial in a case in which the defendant has confessed to a senseless, brutal killing. We do not take such action lightly, but only because the

Constitution compels it. It is not our function "to pass on the guilt or innocence of the petitioner of the atrocious crime that was committed." *Davis v. North Carolina*, 384 U.S. 737, 739, 86 S.Ct. 1761, 1763, 16 L.Ed.2d 895 (1966). Rather, "[o]ur duty is to uphold the Constitution of the United States." *Bumper v. North Carolina*, 391 U.S. 543, 551, 88 S.Ct. 1788, 1793, 20 L.Ed.2d 797 (1968). The writ of habeas corpus is the most "fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." *Harris v. Nelson*, 394 U.S. 286, 290–91, 89 S.Ct. 1082, 1086, 22 L.Ed.2d 281 (1969).

> There is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus, for it is in such petitions that a person in custody charges that error, neglect, or evil purpose has resulted in his unlawful confinement and that he is deprived of his freedom contrary to law.

*Id.* at 292, 89 S.Ct. at 1086–87.

As the Supreme Court recognized in approving the grant of the writ of habeas corpus to a man who had confessed to the ruthless murder of a ten-year-old child, although the "pressures" on state officers "charged with the administration of the criminal law are great ... it is precisely the predictability of those pressures that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all." *Brewer v. Williams*, 430 U.S. 387, 406, 97 S.Ct. 1232, 1243, 51 L.Ed.2d 424 (1977).[14] Justice Brandeis warned almost seventy years ago that the "existence of the government will be imperiled if it fails to observe the law scrupulously" and so a court cannot "declare that in the administration of the criminal law the end justifies the means...." *See Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

■■■ We recognize that "the writ of habeas corpus has historically been regarded as an extraordinary remedy," *Brecht*, 507 U.S. at ——, 113 S.Ct. at 1719, but this is an extraordinary case. It is an example of one of those "rare instances," *O'Neal*, —— U.S. at ——, 115 S.Ct. at 1000 (Thomas, J., dissenting), where an error of constitutional dimension has infected a state court conviction with fundamental unfairness and yet has escaped recognition by the state's system of judicial review. In such rare instances, a federal court has a duty to intercede. Our purpose in intervening in this case is not to help an admitted criminal avoid punishment; it is to protect the Constitution. While granting the writ of habeas corpus will have the immediate effect of nullifying a state conviction, it will have the long-term effect of ensuring the integrity of the state and federal judicial processes. This is what the Constitution demands, and this is why we must reverse and remand this case to the district court with instructions to grant the writ of habeas corpus.

*REVERSED AND REMANDED WITH INSTRUCTIONS.*

NIEMEYER, Circuit Judge, dissenting:

Kamathene Adonia Cooper confessed to law enforcement officers on three separate occasions that he had murdered Rheupert W. Stewart in Lake City, South Carolina. After conducting a separate hearing, the state trial court found that Cooper's confessions had been given voluntarily and were not otherwise constitutionally impaired. Based on those confessions, a jury convicted Cooper, and the court sentenced him to life imprisonment. The Supreme Court of South Carolina affirmed the judgment.

In his petition for habeas corpus, filed under 28 U.S.C. § 2254, Cooper argues that his confessions were admitted at his state criminal trial in violation of his right to counsel under the Fifth and Fourteenth Amendments. He contends that police took his

---

14. Without denigrating the costs inherent in retrying a criminal defendant, we note that " '[a] prisoner ... need not go free if he is in fact guilty, for [the State] may ... try him again by the procedure which conforms to constitutional requirements.' " *Rose v. Mitchell*, 443 U.S. 545, 558, 99 S.Ct. 2993, 3001, 61 L.Ed.2d 739 (1979) (quoting *Hill v. Texas*, 316 U.S. 400, 406, 62 S.Ct. 1159, 1162, 86 L.Ed. 1559 (1942)).

confessions without honoring his desire to remain silent or his request for an attorney.

Cooper's habeas petition was referred to a magistrate judge who reviewed the entire record and concluded that Cooper's first two confessions were voluntary and not otherwise constitutionally infirm. While finding that Cooper's third confession had been admitted in violation of his right to counsel under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the magistrate judge held that the state trial court's erroneous admission of that confession was harmless because the confession was cumulative and the jury would have convicted Cooper solely on his first two valid confessions. Accordingly, the magistrate judge recommended that the district court deny the petition for the writ of habeas corpus.

The district court reviewed the matter *de novo* and agreed with the magistrate judge, concluding that Cooper's first two confessions were not constitutionally infirm and that the admission of the third confession in violation of Cooper's right to counsel was harmless. The district court denied Cooper's petition, and Cooper appealed. For the reasons that follow, I would affirm the district court's decision.

I

Rheupert Stewart was found murdered in his home on December 1, 1984. The right rear pocket of his pants had been turned out and pieces of a broken chair were scattered about his body. An autopsy revealed that Stewart had been beaten with a blunt object and stabbed in the head and chest with a knife. The coroner concluded that Stewart had died on November 30, 1984, from a stab wound to his brain.

A few days after Stewart's body was found, an investigation of a forged check drawn on Stewart's account led police to Cooper. Cooper had written his driver's license number on the back of the check. Based on that information, a warrant issued for Cooper's arrest.

Upon Cooper's arrest, officers advised him of his *Miranda* rights. When custody of Cooper was transferred to other officers, they too advised him of his rights. Although Cooper did not invoke his right to counsel, he indicated that he did not wish "to make any comments."

Cooper was thereafter taken to the Florence County Sheriff's Department and delivered to Agent Vause. Agent Vause read Cooper his rights, yet again, and asked him if he wished to take a polygraph examination. Cooper responded affirmatively.

On the way to Columbia, South Carolina, where Cooper's polygraph test was to be conducted, the officers stopped in Lake City to drop off an officer. While the car was stopped in Lake City, Cooper saw Philip Grimsley, an officer of the State Alcoholic Beverage Commission, whom Cooper had known for some time. Cooper said, "There goes Phil. I would like to talk to him."

Cooper informed Grimsley that he had been arrested "for stealing a check and cashing it," but insisted, "I ain't killed no man." Grimsley then asked for and obtained permission from Cooper's custodial officers to talk to Cooper in private. Before proceeding, Grimsley asked the officers whether Cooper had been advised of his *Miranda* rights. When informed that he had, Grimsley returned to the room with Cooper and, nevertheless, read Cooper his rights for a fourth time. Grimsley then asked Cooper if he had anything to say. In response, Cooper indicated only that he had cashed a check in Lake City. According to Grimsley's account, the following then occurred:

[Cooper] became upset. He was nervous. Tears came into his eyes. I could tell there was something definitely bothering him. I asked him if there was something he needed to say. Something he needed to get off his chest, now was the time to do it.

At this time, he reached over and grabbed my hand and held onto it tightly. And he asked me if I did do it, what would happen to me? What would I get. I looked at him. I asked him, I said you don't want me to lie to you, do you? If you killed Mr. Stewart and you're convicted in Court, you could die in the electric chair or you could receive a life sentence. That

would strictly be left up to a judge and jury. At this time, he told me, I did it.

Upon hearing Cooper's admission, Grimsley asked Cooper to be more specific so that he could verify Cooper's statement. Although Cooper initially expressed reluctance "to go back through it," he then continued his confession without interruption. Explaining in detail how he had murdered Stewart, Cooper told Grimsley that he had hit Stewart over the head with a chair and stabbed him in the head and chest. Cooper also agreed to make a taped statement in front of other officers.

When the officers in whose custody Cooper was traveling were brought into the room, Agent Vause asked Cooper if he understood his rights as read to him by Officer Grimsley and whether he would talk to the other officers. Cooper responded that he understood his rights and repeated his confession to those officers. Cooper stated that he had visited Stewart's home to discuss repairs to the house that the Cooper family rented from Stewart. Cooper also indicated that he had asked Stewart for a basketball. As Stewart bent over to pick up the basketball, Cooper took a chair and hit Stewart over the head with it three times. Cooper also admitted taking Stewart's checkbook and throwing both the checkbook and the knife he had used to kill Stewart behind a Lake City warehouse.

After confessing twice, Cooper gave a third tape-recorded confession, which described Stewart's murder in yet greater detail. During the course of this third confession, Cooper expressed a desire to have a lawyer present. At the same time, Cooper agreed to continue answering questions without a lawyer.

## II

Cooper's petition for habeas corpus relief under 28 U.S.C. § 2254 presents us with the question of whether the state trial court's decision to admit his third confession into evidence at his murder trial unconstitutionally undermined the reliability of his conviction.

The process already afforded Cooper by the State of South Carolina deserves men-tion. South Carolina authorities have arrested, tried, and convicted Cooper, and that state's highest court has affirmed his conviction. We must begin, therefore, with a healthy respect for the state courts' ability to conduct just trials and to ferret out constitutional error, both at the trial and appellate levels. See Rose v. Lundy, 455 U.S. 509, 515, 102 S.Ct. 1198, 1201–02, 71 L.Ed.2d 379 (1982) ("[Habeas corpus jurisdiction] should be exercised in light of the relations existing under our system of government, between the judicial tribunals of the Union and of the States, and in recognition of the fact that the public good requires that those relations be not disturbed by unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution.") (quoting Ex parte Royall, 117 U.S. 241, 251, 6 S.Ct. 734, 740, 29 L.Ed. 868 (1886)). This respect not only enables the federal and state judicial systems to function with a spirit of cooperation and harmony but also conserves their scarce resources.

In the context of those principles, there remains a special role conferred upon federal courts by 28 U.S.C. § 2254: to ensure that persons do not remain in custody because of violations of the United States Constitution. But the scope of federal courts' authority under § 2254 is quite limited. Unless the defendant's custodial status exists by reason of a violation of the federal constitution, federal courts must yield to the state judicial process. See Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Thus, before granting the writ of habeas corpus to a petitioner whose state custody resulted from a criminal conviction, we must determine whether the petitioner's trial violated his federal constitutional rights and whether that violation was the cause of his detention (i.e., whether the error was harmful). Recently, in O'Neal v. McAninch, the Supreme Court instructed that for a state trial error to justify issuance of the habeas writ, a federal court must have "grave doubt as to the harmlessness of [the] error." —— U.S. ——, ——, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995). This case causes me no such doubt.

To the contrary, I am convinced beyond doubt that the jury in this case would have convicted Cooper without his third confession. I reach this conclusion because, absent any objection or defense, Cooper's two earlier, valid confessions would have accurately presented at trial the position Cooper voluntarily expressed to the police concerning Rheupert Stewart's murder: "I did it." In *Arizona v. Fulminante,* the Supreme Court acknowledged the unique power of confessions:

> A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."

499 U.S. 279, 296, 111 S.Ct. 1246, 1257–58, 113 L.Ed.2d 302 (1991) (quoting *Bruton v. United States,* 391 U.S. 123, 139–40, 88 S.Ct. 1620, 1630, 20 L.Ed.2d 476 (1968) (White, J., dissenting)).

My conclusion that the trial court's erroneous admission of Cooper's third confession was harmless is buttressed by indicia confirming the reliability of Cooper's first two confessions. Cooper initiated the first of his confessions after observing a police officer with whom he had a prior acquaintance. It was Cooper, moreover, who first suggested to the officer that anyone had been killed— Cooper was only being held for forgery. Furthermore, in his first two confessions, Cooper not only described the broken chair and Stewart's stab wounds without ever having been given any prior information about the murder scene but also revealed the location of Stewart's stolen checkbook and the knife used to kill Stewart. When that information is coupled with Cooper's handwriting exemplar, the evidence confirming his driver's license number on the back of Stewart's check, the independent description of the murder scene provided by the officers, and the autopsy evidence concerning the cause of Stewart's death, the conclusion that Cooper murdered Stewart is inescapable. Finally, but by no means least importantly, Cooper never proffered any evidence to rebut either the information he provided in his confessions or any other part of the government's case.

Nor did the circumstances that rendered Cooper's third confession inadmissible cast any doubt on the trustworthiness of his earlier two confessions. By all accounts, Cooper's third confession was not factually coerced or otherwise produced by threats; Cooper gave it freely and calmly. While Cooper's right to counsel prevents courts from considering his third confession in determining his guilt, that confession nevertheless indicates that the denial of his request for counsel in no way undermined the trustworthiness of his earlier confessions.

The majority were particularly impressed by the facts that Cooper's third confession was recorded, that its transcription spanned more than 19 pages, and that it revealed details not included in the earlier confessions. But in light of the information provided in Cooper's first two confessions, the circumstances surrounding those confessions, the corroborating evidence presented at Cooper's trial, and Cooper's failure to rebut any of the overwhelming evidence against him, I cannot conclude that the facts relied on by the majority render reversible the trial court's error in admitting Cooper's third confession.

Once we set aside the state trial court's constitutional error as harmless, our task ends and we must yield to the state judicial system that convicted Cooper of murder and sentenced him to life in prison. I would, therefore, affirm the district court's decision to deny Cooper's petition.