OCTOBER 17, 1990

No. 90–5958 (A–294). EVANS v. MUNCY, WARDEN, ET AL. C. A. 4th Cir. Application for stay of execution of sentence of death, presented to THE CHIEF JUSTICE, and by him referred to the Court, denied. Certiorari denied.

JUSTICE MARSHALL, dissenting.

This Court's approval of the death penalty has turned on the premise that given sufficient procedural safeguards the death penalty may be administered fairly and reliably. *E. g.*, *Gregg* v. *Georgia*, 428 U. S. 153, 195–196, and n. 47 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.). Wilbert Evans' plea to be spared from execution demonstrates the fallacy of this assumption. Notwithstanding the panoply of procedural protections afforded Evans by this Court's capital jurisprudence, Evans today faces an imminent execution that even the State of Virginia appears to concede is indefensible in light of the undisputed facts proffered by Evans. Because an execution under these circumstances highlights the inherently cruel and unusual character of capital punishment, I dissent.

I

Evans was convicted of capital murder and sentenced to death. At the sentencing phase, the jury's verdict was predicated on a *single* aggravating circumstance: that if allowed to live Evans would pose a serious threat of future danger to society. See Va. Code § 19.2–264.4(C) (1990). Without this finding, Evans could not have been sentenced to death. See *e. g.*, *Furman* v. *Georgia*, 408 U. S. 238, 313 (1972) (WHITE, J., concurring) (existence of aggravating circumstance "distinguishing the few cases in which [the death penalty] is imposed" from those in which it is not is a constitutional prerequisite to death sentence); *Gregg* v. *Georgia*, *supra*, at 188–189 (same).[1]

[1] Evans initially was sentenced to death in April 1981. At his first sentencing proceeding, the prosecutor proved Evans' future dangerousness principally through reliance upon seven purported out-of-state convictions, two of which the prosecutor later admitted were false. Two years later, after having relied on these bogus convictions in its successful oppositions to both Evans' direct appeal to the Virginia Supreme Court and his petition for a writ of certiorari to this Court, the State confessed error. Evans' death sentence

While Evans was on death row at the Mecklenberg Correctional Facility, an event occurred that casts grave doubt on the jury's prediction of Evans' future dangerousness. On May 31, 1984, six death row inmates at Mecklenberg attempted to engineer an escape. Armed with makeshift knives, these inmates took hostage 12 prison guards and 2 female nurses. The guards were stripped of their clothes and weapons, bound, and blindfolded. The nurses also were stripped of their clothes, and one was bound to an inmate's bed.

According to uncontested affidavits presented by guards taken hostage during the uprising, Evans took decisive steps to calm the riot, saving the lives of several hostages, and preventing the rape of one of the nurses.[2] For instance, Officer Ricardo Holmes, who was bound by the escaping inmates and forced into a closet with other hostages, states that he heard Evans imploring to the escaping inmates, "'Don't hurt anybody and everything will be allright.'" Officer Holmes continues:

> "It was very clear to me that [Evans] was trying to keep [the escaping inmates] calm and prevent them from getting out of control . . . . Based upon what I saw and heard, it is my firm opinion that if any of the escaping inmates had tried to harm us, Evans would have come to our aid. It is my belief that had it not been for Evans, I might not be here today." See Pet. for Cert., Exh. 14.

Other guards taken hostage during the uprising verify Officer Holmes' judgment that Evans protected them and the other hostages from danger. According to Officer Prince Thomas, Evans interceded to prevent the rape of Nurse Ethyl Barksdale by one of the escaping inmates. *Id.*, Exh. 9. Officer Harold Crutchfield affirms that Evans' appeals to the escapees not to harm anyone may have meant the difference between life and death for the hostages. "It is . . . my firm belief that if Evans had not been present during the escape, things may have blown up and people

---

was vacated, and he was granted a new sentencing hearing. See *Evans* v. *Virginia,* 471 U. S. 1025, 1026–1027 (1985) (MARSHALL, J., dissenting from denial of certiorari). In March 1984, Evans once again was sentenced to death. It is this second death sentence which he now seeks to stay.

[2] The affiant prison officials all attest that Evans played no role in instigating the riot.

may have been harmed." *Id.*, Exh. 8. According to Officer Crutchfield, after the escapees had left the area in which they were holding the guards hostage, Evans tried to force open the closet door and free the guards—albeit unsuccessfully. *Ibid.* Officers Holmes, Thomas, and Crutchfield, and five other prison officials all attest that Evans' conduct during the May 31, 1984, uprising was consistent with his exemplary behavior during his close to 10 years on death row. *Id.*, Exhs. 8–15.

Evans filed a writ of habeas corpus and application for a stay of his execution before the United States District Court for the Eastern District of Virginia. He urged that the jury's prediction of his future dangerousness be reexamined in light of his conduct during the Mecklenburg uprising. Evans proffered that these events would prove that the jury's prediction was unsound and thereby invalidate the sole aggravating circumstance on which the jury based its death sentence. For this reason, Evans argued that his death sentence must be vacated. The District Court stayed the execution and ordered a hearing. Civ. No. 90–00559–R (ED Va., Oct. 13, 1990). The Court of Appeals reversed and vacated the stay. No. 90–4007 (CA4, Oct. 16, 1990) *(per curiam)*.

## II

Remarkably, the State of Virginia's opposition to Evans' application to stay the execution barely contests either Evans' depiction of the relevant events or Evans' conclusion that these events reveal the clear error of the jury's prediction of Evans' future dangerousness.[3] In other words, the State concedes that the sole

---

[3] Equally remarkable is the sheer gall of the manner in which the State makes its feeble challenge. For six years, Evans' counsel has tried to pry loose from the State copies of its investigative reports of the uprising. Counsel steadfastly has contended that these reports would support Evans' account of the relevant events and thereby strengthen Evans' claims for both legal relief and executive clemency. The State has refused to release its iron grip on these materials and to this moment has not made them available to him. See Pet. for Cert., Exh. 6.

According to Evans' counsel, late last evening he was contacted by counsel for Willie Lloyd Turner, another Virginia death row inmate involved in the Mecklenburg uprising. Notwithstanding its refusal to cooperate with Evans' request for the investigative reports, the State, without protest, had provided these reports to Turner's counsel. Upon learning of Evans' impending execution, Turner's counsel immediately delivered these materials to Evans' coun-

basis for Evans' death sentence—future dangerousness—in fact *does not exist.*

The only ground asserted by the State for permitting Evans' execution to go forward is its interest in procedural finality. According to the State, permitting a death row inmate to challenge a finding of future dangerousness by reference to facts occurring after the sentence will unleash an endless stream of litigation. Each instance of an inmate's postsentencing nonviolent conduct, the State argues, will form the basis of a new attack upon a jury's finding of future dangerousness, and with each new claim will come appeals and collateral attacks. By denying Evans' application for a stay, this Court implicitly endorses the State's conclusion that it is entitled to look the other way when late-arriving evidence upsets its determination that a particular defendant can lawfully be executed.

In my view, the Court's decision to let Wilbert Evans be put to death is a compelling statement of the failure of this Court's capital jurisprudence. This Court's approach since *Gregg* v. *Georgia* has blithely assumed that strict procedures will satisfy the dictates of the Eighth Amendment's ban on cruel and unusual punishment. As Wilbert Evans' claim makes crystal clear, even the most exacting procedures are fallible. Just as the jury occasionally "gets it wrong" about whether a defendant charged with murder is innocent or guilty, so, too, can the jury "get it wrong" about whether a defendant convicted of murder is deserving of death, notwithstanding the exacting procedures imposed by the Eighth Amendment. The only difference between Wilbert Evans' case and that of many other capital defendants is that the defect in Evans' sentence has been made unmistakably clear for us even before his execution is to be carried out.

The State's interest in "finality" is no answer to this flaw in the capital sentencing system. It may indeed be the case that a State

---

sel, see *id.*, Exh. 17, and Evans has now been able to make them available to us, see *id.*, Exh. 18.

Now that Evans finally has possession of information the State has so deliberately denied him for *six* years, the State cites two isolated excerpts from a lengthy set of materials in a mean and deceitful attempt to belittle Evans' claims. See App. to Brief in Opposition 1–2. A more honest and thorough review of these materials, which include numerous interviews with the hostages and reports of the State's investigators, reveals that these materials in no way diminish Evans' account of the relevant events.

cannot realistically accommodate postsentencing evidence casting doubt on a jury's finding of future dangerousness; but it hardly follows from this that it is *Wilbert Evans* who should bear the burden of this procedural limitation. In other words, if it is impossible to construct a system capable of accommodating *all* evidence relevant to a man's entitlement to be spared death—no matter when that evidence is disclosed—then it is the *system*, not the life of the man sentenced to death, that should be dispatched.

The indifferent shrug of the shoulders with which the Court answers the failure of its procedures in this case reveals the utter bankruptcy of its notion that a system of capital punishment can coexist with the Eighth Amendment. A death sentence that is *dead wrong* is no less so simply because its deficiency is not uncovered until the eleventh hour. A system of capital punishment that would permit Wilbert Evans' execution notwithstanding as-to-now unrefuted evidence showing that death is an improper sentence is a system that cannot stand.

I would stay Wilbert Evans' execution.