**Ronald Gene DANIEL, Petitioner,**

v.

**STATE OF WEST VIRGINIA [George Trent, Warden, Mount Olive Correctional Complex], Respondent.**

Civ. A. No. 5:96–0033.

United States District Court,
S.D. West Virginia,
at Beckley.

May 5, 1997.

Edward H. Weis, Asst. Fed. Public Defender, Charleston, WV, for petitioner.

Dawn E. Warfield, Deputy Attorney General, Charleston, WV, for respondent.

### OPINION

FABER, District Judge.

■ This Opinion replaces the court's original Opinion filed in this case on March 31, 1997. By Judgment Order entered on that date, this court denied the application of petitioner Ronald Gene Daniel ("Daniel") for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On April 10, 1997, Daniel filed a

"Motion for Reconsideration of Denial of Habeas Corpus Petition" under Rules 59 and 60 of the Federal Rules of Civil Procedure.[1] The issues raised by the motion for reconsideration overlap, and are intertwined with, issues considered by the court in its original Opinion; the court has withdrawn that Opinion and substitutes this one for it so that all the court's reasoning in support of its judgment may be found in one place.

## I. *Statement of Facts*

This case presents a fact pattern all too common in this jurisdiction: an evening begins with social drinking among friends, includes a visit to a neighborhood tavern, then degenerates into conflict, violence and death.

On the evening of July 8, 1988, Daniel accompanied two friends, Lisa and Edward Burrell, to "Legends" bar in Daniels, West Virginia. Daniel and the Burrells had consumed some beer together prior to arriving at Legends at approximately 11:30 p.m. At Legends, Daniel ran into Jimmy Torrence, an old acquaintance. Torrence had driven his van to Legends accompanied by his younger brother, Timmy Torrence, and four friends, Bobby Goodson, Aaron Bolen, Cecil Miller and Walter Dale Morgan. For Morgan, it was his last night out. Jimmy Torrence and Miller had gone into Legends, while the other members of the Torrence party, all of whom had been drinking and smoking marijuana, remained outside in the van. Inside the bar, Daniel and Jimmy Torrence drank beer and tequila together and talked. When a person inside the bar said something to Daniel, he showed Torrence a .25 caliber handgun he had concealed in his trousers and told Torrence he was not worried.

When the Burrells left Legends before closing time, Daniel elected to stay behind, indicating he would ride home with Jimmy Torrence. Daniel stayed in the bar until it closed at 3:30 a.m. As he and Jimmy Torrence were leaving, they were "jumped" outside the bar by the Patton brothers, two enemies of Jimmy Torrence. During a short fight, Daniel sustained an eye injury, a bloody cut to his head and a broken partial denture plate.

After the fight, Daniel and Jimmy Torrence got into Torrence's van with Torrence driving and Daniel occupying the front passenger seat. In the back of the van were the five persons who had arrived at Legends in Jimmy Torrence's van plus two other persons—Bobby Lane, who had asked Torrence for a ride home, and a woman, identified much later as Carol Dotson Brammer, whom Lane had met that night in the bar. Lane and Brammer got out of the van at Raleigh Motor Sales, a short distance from Legends. Lane, who testified he did not drink any alcohol that night because he expected to become a "designated driver," said he had a "feeling" which made him want to get out of the van.[2] Lane also testified at Daniel's trial that Daniel appeared upset with Walter Dale Morgan because Morgan, an old friend of Daniel's, had refused to help him in the fight with the Patton brothers.

After dropping off Lane and Brammer, Jimmy Torrence continued driving home. Cecil Miller was passed out on the floor of the van. The other passengers were in the back of the van listening to music. At trial, Daniel testified that he became confused and disoriented due to the combined impact of the alcohol he had consumed and the injuries he had sustained in the fight with the Pattons. He also stated that he did not trust Jimmy Torrence, that he did not know who was in the back of the van, that he felt threatened by these unknown persons and feared for his life. Daniel drew his handgun, held it to Jimmy Torrence's head and told Torrence to take him to the police; he insist-

---

**1.** Although the Federal Rules of Civil Procedure do not specifically refer to motions for reconsideration, the cases make clear that such a motion filed within ten days of a judgment, as was petitioner's motion here, may be treated as a motion to alter or amend that judgment under Rule 59(e). *Perkins v. United States*, 848 F.Supp. 1236 (S.D.W.Va.1994) and cases cited therein.

**2.** At Daniel's trial, Lane explained out of the presence of the jury that he felt uneasy because he had heard the petitioner was a suspect in the death of his wife. Daniel was indicted for killing his wife, Tammy Hensdale Daniel, but the State moved to dismiss the indictment because of insufficient evidence.

ed, however, that Torrence proceed in a direction opposite to the location of the nearest police station.

Claiming that several people were coming toward him from the rear of the van in a threatening manner, Daniel fired three shots which he insisted at trial were warning shots fired into the floor of the van. Two of these shots struck Walter Dale Morgan in the chest, fatally wounding him. The third shot passed through the arm of Cecil Miller, who remained unconscious on the floor of the van. When the three shots were fired, Jimmy Torrence stopped the van and all the passengers except Miller (including the mortally-wounded Morgan) jumped out of the back of the van. Daniel ordered Jimmy Torrence to resume driving, continuing to hold him at gunpoint. Torrence did so, but stopped when he came to a police cruiser beside the road. Daniel, still holding the gun to Torrence's head, relinquished it when approached by a police officer. Daniel was taken into custody, given his *Miranda* rights, and questioned by Deputy Orval Ayers and Detective Arthur Bolen of the Raleigh County Sheriff's Department. Daniel made some exculpatory statements to the two police officers, contending he had acted in self-defense, then refused to answer any more questions and asked for his lawyer.

At his trial, Daniel testified that he did not intend to kill anyone and that he fired the gun only because he feared for his life. He was convicted of first degree murder in the death of Morgan and malicious wounding of Miller, in spite of the fact that the only evidence to show premeditation or deliberation was Lane's testimony that Daniel appeared upset with Morgan because Morgan had refused to intervene in the fight with the Pattons. Daniel received consecutive sentences of ten years to life on the murder conviction and three to ten years on the malicious wounding charge. He is presently incarcerated at the Mount Olive Correctional Complex in Mount Olive, West Virginia.

This case is the subject of two reported decisions by the Supreme Court of Appeals of West Virginia. See *State v. Daniel*, 182 W.Va. 643, 391 S.E.2d 90 (1990) (direct appeal of Daniel's conviction); *State ex rel. Daniel v. Legursky*, 195 W.Va. 314, 465 S.E.2d 416 (W.Va.1995) (state court action for post conviction habeas corpus relief). After these unsuccessful efforts to obtain relief in state court, Daniel filed the present petition for a federal writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition Daniel raised the following eight grounds for relief: (1) denial of effective assistance of counsel; (2) failure of the state to disclose exculpatory evidence; (3) prosecutorial misconduct; (4) one of the trial court's instructions unconstitutionally shifted the burden of proof on the issue of malice; (5) absence of the petitioner at a critical stage during his trial; (6) improper consecutive sentences for the same offense; (7) violation of his Fifth and Sixth Amendment rights through questioning by police officers when he was in a state of intoxication and had recently undergone a severe beating, as well as the failure of arresting police officers to advise him of the nature of the charges; and (8) cumulative error caused by the several constitutional violations.

On March 5, 1997, the Magistrate Judge to whom this case was referred filed her Findings and Recommendations in which she urged this court to grant Daniel's petition for habeas corpus relief. The Magistrate Judge identified the following three grounds, each of which in her view supports issuance of the writ: (1) ineffective assistance of counsel incident to an issue involving improper juror contacts; (2) improper comments in oral argument and on cross-examination by the assistant prosecuting attorney, in violation of Daniel's Fifth Amendment right against self-incrimination;[3] and (3) State's Instruction No. 1, which the trial court gave in an edited form, unconstitutionally shifted the burden of proof to Daniel to demonstrate his own innocence.

Respondent filed timely objections to each of the Magistrate Judge's three grounds for granting habeas corpus relief. Similarly,

---

**3.** A similar issue was considered by the United States Supreme Court in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), upon which petitioner and the Magistrate Judge rely.

Daniel filed objections [4] to additional portions of the Magistrate Judge's findings and recommendations, contesting the conclusion that trial counsel's performance was objectively reasonable in his development of a theory of defense. The court conducted a *de novo* review of the complete record in this case in light of the various objections filed by the parties and, on March 31, 1997, filed its Judgment Order and original Opinion denying the relief requested by Petitioner.

In his motion for reconsideration Daniel raised several grounds. The court believes all of these except one to be merely repetitive of issues raised by him in his original objections. The one ground requiring additional comment is Daniel's contention that the court, in its original Opinion, did not properly consider his claim of a Fifth Amendment violation under *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). This court had concluded that Daniel waived this ground by failing to object at trial. Daniel now maintains that his *Doyle* claim cannot be dismissed for procedural default because the opinions of the Supreme Court of Appeals of West Virginia did not contain a "plain statement" that he was procedurally barred from raising the *Doyle* claim. In support of this argument Daniel relies on several United States Supreme Court cases which discuss the doctrine of adequate and independent state grounds.[5] The court will consider in turn each of the three objections made by the respondent to the findings and recommendations of the Magistrate Judge and then consider the objections of Daniel, including the argument based on *Doyle* contained in his motion to reconsider. Lastly, the court will address the cumulative impact of the alleged errors and the plain error doctrine.

## II. *Discussion*

### A. Improper Juror Contacts

After the jury's verdict, the parties learned that Daniel's girlfriend, Betty Kelly, who ran a used car lot, had called juror Carolyn Dillon two times during the evening prior to jury deliberations. Kelly offered to make Dillon's son a deal on a car and asked Dillon to do what she could for Daniel.

After the jury had deliberated, reached a verdict and signed the verdict forms, Dillon told her fellow jurors about the calls received from Kelly the previous night. Dillon, however, did not tell the trial judge or anyone other than her fellow jurors about the calls at that time. Approximately three weeks after the trial, Dillon contacted the trial judge and told him about Kelly's calls; she also discussed the calls with Daniel's attorney over the telephone. Daniel's attorney reported the matter to the trial judge and asked for a mistrial; however, he did not investigate the matter further, or demand an evidentiary hearing. The trial judge consulted with the prosecuting attorney, spoke with Dillon *ex parte in camera,* concluded that no harm had been done, and denied the motion for a mistrial without a hearing. The trial judge made no record of his interview with Dillon. Daniel was not informed of these proceedings until after the judge had refused to declare a mistrial.

Years later, at Daniel's omnibus state habeas corpus hearing in the Circuit Court of Raleigh County, West Virginia, Dillon testified and also filed an affidavit under oath. Her evidence covered, not only the fact and substance of Kelly's contacts, but also their impact on her. Also, she revealed, apparently for the first time, that another juror had told her she also had been contacted by Kelly. Dillon could not recall the name of the other juror. She believed her name was Betty, but could not remember her last name. The record reflects, however, that there was no one named Betty on the jury. According to Dillon, the other juror did not

---

**4.** On March 14, 1997, petitioner filed a motion for an extension of time in which to file objections. In the interest of justice, the court **GRANTS** petitioner's motion and considers his objections to be timely.

**5.** Petitioner cites the following cases: *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Ulster County Court v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

tell Dillon what Kelly had said to her and, curiously, Dillon did not ask. Dillon testified that Kelly's phone calls did not influence her or affect her verdict in any way, nor did the calls cause her to feel more willing to convict Daniel than if such contacts had not been made. There was no objection to Dillon's testimony by the attorney who represented Daniel at the omnibus hearing; this was a different lawyer than the one who had represented Daniel at trial.

The court's duty in analyzing an issue involving improper juror contacts is made clear by the cases of *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), and *Haley v. Blue Ridge Transfer Co.,* 802 F.2d 1532 (4th Cir.1986). In *Remmer,* the Supreme Court held that private communications to jurors during trial are presumptively prejudicial and the burden of rebutting such presumption rests heavily on the party seeking to support the verdict. 347 U.S. at 229, 74 S.Ct. at 451. *Remmer* directs the court to hold a hearing whenever an issue of improper contacts with a juror is raised. *Id.* In *Haley,* the Fourth Circuit established a three-step process to be followed by a court considering a challenge to a verdict based upon the testimony of a juror. The court must ask: (1) Is the juror's testimony competent to impeach the verdict? (2) If the evidence is competent, does it establish (in conjunction with Remmer's presumption of prejudice) that the impropriety was prejudicial? (3) Does the evidence offered by the party supporting the verdict rebut the presumption and evidence of prejudice? 802 F.2d at 1536–37.

Daniel has framed his argument for a writ of habeas corpus based upon improper jury contacts as a subpart of his ineffective assistance of counsel ground. He offers counsel's failure to request a hearing concerning the improper jury contact as one of five examples of ineffective assistance.[6] In his state habeas corpus proceeding, the Supreme Court of Appeals of West Virginia agreed that failure to request a hearing was ineffective assistance of counsel, but held that "the error was

cured by the extensive hearing and development of these facts in the habeas corpus hearing, albeit six years later." *Daniel v. Legursky,* 465 S.E.2d at 425.

Approximately one month before the omnibus habeas corpus hearing in state court, West Virginia Rule of Evidence 606(b) was amended to parallel the corresponding federal rule and render a juror incompetent to testify "to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict...." The Magistrate Judge concluded that Dillon's testimony concerning the fact and nature of the contacts was admissible to raise the presumption of prejudice under *Remmer,* but that her testimony about the impact of the contacts should have been excluded under Rule 606(b). The Magistrate Judge was of the opinion that the only evidence to rebut the presumption of prejudice arising from the juror contact was that portion of Dillon's testimony which should have been excluded. Applying the *Remmer* presumption and the Fourth Circuit's analysis in *Haley,* the Magistrate Judge reasoned that Daniel had been presumptively prejudiced by the improper juror contacts and that his counsel had rendered ineffective assistance in failing to ask for an evidentiary hearing on the jury tampering issue. The Magistrate Judge was also of the opinion that *United States v. Cheek,* 94 F.3d 136 (4th Cir.1996), is factually on point and compels the conclusion that Daniel's constitutional rights had been violated, requiring him to be retried or released. In *Cheek,* a juror's testimony that he had listened to all the evidence and considered it in reaching his verdict was held to have been improperly admitted under Rule 606(b).

■ This court believes the Magistrate Judge's reliance on Rule 606(b) and the *Cheek* case is misplaced. First, the 606(b) issue had never been raised at any point in these very lengthy state and federal proceedings until the Magistrate Judge raised it herself *sua sponte.* Petitioner has never objected to Dillon's testimony on 606(b)

---

**6.** The Magistrate Judge concluded that the other grounds offered in support of Daniel's ineffective assistance claims were without merit.

grounds, nor has he ever contended that his rights were infringed by the admission of evidence in contravention of that rule. Daniel's contention, insofar as it relates to the improper jury contact, is that he was denied effective assistance of counsel when his attorney failed to demand a hearing on the jury tampering issue.[7] While he had to wait some six years, Daniel did, in fact, receive a full hearing on this issue in the omnibus habeas corpus proceeding before Judge Ashworth in the Circuit Court of Raleigh County. As the Supreme Court of Appeals of West Virginia held, Daniel has now had his hearing and that defect has been cured. *Daniel v. Legursky*, 465 S.E.2d at 425.

■ Additionally, this court is unconvinced by the Magistrate Judge's reliance on *Cheek*. In sharp contrast to the case now before this court, the defendant in *Cheek* objected to the juror's testimony on Rule 606(b) grounds and vigorously pursued that issue in both the trial and appellate courts. It is a fundamental maxim of the laws of both the United States and West Virginia that an appellate court will not consider a point unless that point was made the subject of a specific objection or offer of proof. Numerous federal cases supporting this proposition are collected at 1 Weinstein & Burger, *Weinstein's Evidence*, ¶ 103[02] (1996); West Virginia cases are collected at 1B *Michie's Jurisprudence*, Appeal and Error, § 103 (1995). West Virginia follows the general rule that an error, not objected to, will not be reviewed on appeal, even if that error is of constitutional magnitude. *State v. Hutchinson*, 176 W.Va. 172, 342 S.E.2d 138, 142 (1986) (citing W. Va. R.Crim. P. 30). The reasons for this rule are succinctly summarized at 1 Saltzburg, Martin & Capra, **Federal Rules of Evidence Manual**, p. 21 (6th ed.1994):

> The requirement of a timely and specific objection is not a mere formality. Objections are required so that the court is notified of a possible error, thus providing the court an opportunity to correct an

error and obviating the need for appeal. Specific objections are also required, in fairness, to allow the opponent an opportunity for timely argument on the question. Finally, courts are concerned that, without a requirement of a timely objection, a party could remain silent at trial in the hope of a favorable trial outcome, with the insurance policy of an appeal should that hope not become reality.

■ The rule requiring a timely and specific objection applies with equal vigor in habeas corpus litigation. Failure to comply with the state contemporaneous objection rule provides an independent state procedural ground for denying federal habeas corpus relief. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Bond v. Procunier*, 780 F.2d 461 (4th Cir.1986).

The United States Court of Appeals for the Fourth Circuit considered this principle in a habeas corpus case involving the West Virginia contemporaneous objection rule. In that case, *Meadows v. Legursky*, 904 F.2d 903 (4th Cir.) *cert. denied*, 498 U.S. 986, 111 S.Ct. 523, 112 L.Ed.2d 534 (1990), Judge Hall, writing for an *en banc* court, stated:

> A defendant's failure to observe a state's contemporaneous objection rule may be an "adequate and independent state ground" that bars federal habeas relief. This doctrine is a "well-established principle of federalism" which recognizes that a state's conduct of its criminal proceedings should be accorded respect by the federal courts. However, the "adequacy" component of the *Wainwright v. Sykes* doctrine is only satisfied if the procedural bar is "regularly or consistently applied" by the state court. Our review of the decisions involving West Virginia's contemporaneous objection rule convinces us that this procedural bar satisfies this requirement of consistent application and, consequently, constitutes an "adequate and independent state ground" upon which federal review may be precluded. (citations omitted).

---

**7.** Since the Rule 606(b) point is part of, and subsumed in, Daniel's improper juror contact argument, which was raised and resolved in the state proceedings, the court considers the exhaustion requirement to have been satisfied, even though the specific evidentiary point has not been previously considered.

904 F.2d at 906. *See also, Waye v. Townley,* 871 F.2d 18, 19 (4th Cir.) *cert. denied,* 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 710 (1989); *Bond v. Procunier,* 780 F.2d 461, 464 (4th Cir.1986).

■ There having been no objection to Dillon's testimony under Rule 606(b), Judge Ashworth and the Supreme Court of Appeals of West Virginia were free to consider it. An objection to the competency of a witness is waived if not made at the time the witness is presented. *United States v. Odom,* 736 F.2d 104, 112 (4th Cir.1984). Dillon's testimony concerning the impact of Kelly's calls effectively rebuts the presumption of prejudice arising from those calls.

Additionally, as respondent points out in its objections to the Findings and Recommendations of the Magistrate Judge, Rule 606(b) "is not of constitutional magnitude." (Resp.'s Objections, at 13). Prior to the amendment of Federal Rule 606(b), the United States Supreme Court considered testimony by jurors about the impact of improper contacts upon their verdicts. *See Parker v. Gladden,* 385 U.S. 363, 365, 87 S.Ct. 468, 470–71, 17 L.Ed.2d 420 (1966). In *Gladden,* the juror's testimony was relied upon to impeach the verdict. *Id.* If such evidence can serve to impeach a verdict, however, it should likewise be capable of supporting one. Similarly, if a violation of Federal Rule 606(b) does not violate the United States Constitution, it can hardly be contended that a violation of West Virginia Rule 606(b) does so.

■ The contact by Kelly of another juror to which Dillon testified presents a different problem. The evidence of such contact is weak and inconclusive at best. It consists solely of the uncorroborated hearsay testimony of Dillon offered several years after the fact. Dillon could not remember the name of the other juror and did not otherwise identify her. Dillon claimed to have been told nothing about the nature or substance of the contact. Based solely on what she was told by the unnamed juror, Dillon testified only to the fact that such a contact was made. The *Remmer* presumption is raised by unauthorized or improper contacts; the contact must concern the matter pending

before the jury and not be in pursuance of court rules or the instructions and directions of the judge. *Remmer,* 347 U.S. at 229, 74 S.Ct. at 451. There is nothing in Dillon's testimony about this contact to show that the contact was other than innocuous. While we may speculate that such contact, if made, was similar in nature to Kelly's contacts with Dillon, which were improper, such speculation, based upon Dillon's uncorroborated hearsay testimony and tainted by her hazy recollection years after the event, is too thin a reed to support the extreme remedy of habeas corpus relief. The court therefore concludes that the evidence of such contact is insufficient to establish the fact of an unauthorized or improper contact and raise the presumption of prejudice under *Remmer.*

For all of these reasons, the court declines to accept the recommendations of the Magistrate Judge on the ineffective assistance of counsel ground and sustains the respondent's objections thereto.

### B. Right to Silence

Daniel contends that the assistant prosecuting attorney who tried his case, Kristen Keller, committed prosecutorial misconduct by improperly commenting at trial on his silence when he was questioned post arrest by Detective Bolen. There are four specific incidences of such allegedly improper comment.

The first occurred in opening statement as follows:

MS. KELLER: * * * Dr. Romaro will testify that likewise, as the law enforcement officers will, that although he had been injured and that although it was obvious that the Defendant had been drinking, he was not disoriented, in any way, and obviously knew what was going on, he knew what he was saying. The Defendant is turned over to Detective Arthur Bolen, of the Raleigh County Sheriff's Department, Detective Bureau, and Detective Bolen, after again advising the Defendant of his Constitutional Rights, hears from the Defendant that the Defendant was scared for his life, and it was self-defense. So Detective Bolen says; "Well, who did this to you, what did they do to you?" Which

you will hear that the Defendant had no response.

(Resp. Ex. 8A, at 56.) Petitioner's counsel moved for a mistrial; the motion was overruled.

The second time Ms. Keller commented on petitioner's silence was when she questioned Detective Bolen before the jury:

Q   And after you concluded reading the defendant his rights did he tell you his version of what happened and make a statement?

A   He said, "man, this was self-defense, I was afraid for my life."

Q   When the defendant said that, did you ask him a question about that?

A   Yes.

Q   What did you ask the defendant?

A   I said, "well, who did this to you," and he didn't respond. And I said, "well, what did they do that made you in fear for you[r] life," and he didn't respond other than to say, "just take me to jail."

(*Id.*, at 400.) There was no objection to this testimony.

The third time Ms. Keller commented on Daniel's silence took place during her cross-examination of him:

Q   And, do you recall Detective Bolen saying to you, "well who put you in fear of your life, what did they do to you?"

A   The reason I didn't tell him is because I really didn't know who had jumped on me, I did not know.

Q   And was there a reason that you did not tell him the whole story about losing consciousness and thinking that these men were attacking you, and feeling in fear of your life, like a wounded animal?

A   I started telling him close to what happened, but I really didn't remember everything that happened, and I couldn't tell him, because I didn't know, and when you tell somebody that this person did this or this person did that and it turned out that it didn't, that's, you know, I would have been lying to the man if I'd had told him that I knew who jumped on me, so that's the reason I never said nothing.

Q   And in fact, Detective Bolen testified your response was, "just take me to jail," wasn't it?

A   Right, that's the only thing else, there was nothing else that I could answer to Mr. Bolen, except that I wanted to see an attorney.

Q   When exactly had your memory come back, since you didn't have it on July 9th, 1988, when you were with the police?

A   Could you repeat that question again?

Q   When did you remember exactly what happened, about passing out and not remembering, and the guys running towards you, and all this?

A   That very morning.

Q   July 9th, 1988?

A   Yes.

(Resp. Ex. 8B, at 527–28.) There was no objection to this testimony.

The fourth and final instance took place in closing argument:

BY MS. KELLER: * * *

So the defendant, in Sophia, sure isn't offering any information, he says nothing. * * *

Detective Bolen said the defendant said, "I was in fear of my life." Detective Bolen said, "why, who put you in fear of your life." What was the defendant's answer? "Take me to jail."

Now, the last question that I asked the defendant on cross examination, where he was claiming that the reason he didn't feel like talking to the Detective Bureau was because he was having a memory loss, do you remember? And I asked him, "when exactly did your memory return," he made a mistake there, he accidentally told the truth, and that was July 9th, that very morning.

In fact, I submit to you that the reason the defendant did not want to stick around and talk to Detective Bolen once he knew that Detective Bolen [knew] that there was a body that had been left behind was that his memory was just fine. He needed a little time to think. That self-defense against Cecil and Jimmy just wasn't going to fly anymore, now he's had a little bit more time to think, so now he's modified his self-defense, and if you don't go with

the self-defense that's in his statement, if they won't play anymore, well then, let's try an accident.

(*Id.*, at 676–77.) No objection was made to the reference to Daniel's lack of response.

Relying upon *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), Daniel raised this issue on direct appeal and in his state habeas corpus proceeding. In *Doyle,* the Supreme Court held that it violates the privilege against self-incrimination for a prosecutor to cross-examine a defendant about his failure to talk to police after receiving his *Miranda* warning. *Id.* at 617–19, 96 S.Ct. at 2244–45. In the direct appeal, the West Virginia Supreme Court of Appeals found no merit in this assignment of error and did not specifically discuss it. *State v. Daniel,* 182 W.Va. 643, 391 S.E.2d 90, 93 (1990). The Supreme Court of Appeals again found no merit to this ground and again declined to discuss it in the appeal from the denial of habeas corpus relief by the Circuit Court of Raleigh County. *Daniel v. Legursky,* 195 W.Va. 314, 465 S.E.2d 416, 420 (1995).

In contrast to the case at bar, there was a specific and timely objection in *Doyle.* Such an objection is held to be a necessary prerequisite to relief on *Doyle* grounds. A similar claim under *Doyle* was precisely the issue raised in *Meadows v. Legursky,* 904 F.2d 903 (4th Cir.) *cert. denied,* 498 U.S. 986, 111 S.Ct. 523, 112 L.Ed.2d 534 (1990), discussed above. The Fourth Circuit held in Meadows that the *Doyle* claim was waived by failure to object at trial. 904 F.2d at 906.

On none of the four occasions complained of by Daniel did his counsel at trial interpose a specific objection on *Doyle* grounds. Counsel did move for a mistrial based upon the opening statement reference to Daniel's silence, but the motion for mistrial was not made upon *Doyle* grounds. The motion for mistrial was as follows:

Mr. Froble: I'm gong [sic] to move for a mistrial, Your Honor. The Prosecutor indicated that Arthur Bolen ask [sic] him who did he shoot, his response was no response. I think she indicated that Mr. Daniel has no response whatsoever. If you recall the testimony of Arthur Bolen,

in the hearing, his response was, "wher's [sic] Mr. Froble."

(Resp's Ex. 8A, at 58). Therefore, with regard to three of the four references to Daniel's silence (the second, third and fourth times it came up), there was no response whatsoever by counsel alerting the trial court and the prosecution to any problem. On the fourth occasion (when Ms. Keller first raised the point in opening statement), a motion for mistrial was made. But, by no stretch of the imagination, did that motion specifically raise the *Doyle* ground.

█ Petitioner, in his motion to reconsider, contends that Supreme Court precedent demonstrates that this court may not rely on his failure to make timely objections to the alleged *Doyle* violations:

Long, Harris, Caldwell, and Allen all demonstrate that the mere fact that Daniel allegedly did not comply with the West Virginia contemporaneous objection rule does not, in an[d] of itself, prevent a federal court from reaching his federal claim. In order for Daniel to have forfeited the right to challenge the prosecutor's remarks, the West Virginia Supreme Court of Appeals must have "actually relied" upon the contemporaneous objection rule (i.e., the procedural bar) as an independent basis for its disposition [of] that issue. The court must also have indicated that it was thinking in procedural terms when it ruled [on that] issue. A procedural bar such as the contemporaneous objection rule does not precluded [sic] that consideration of a federal claim on habeas review unless that last state court rendering a judgment in the case " 'clearly and expressly' " states that its judgment rests on a state procedural bar.

(Mem. in Supp. of Mot. for Rec., at 9.) To be sure, there is no "plain and clear" statement that the state courts disposed of petitioner's *Doyle* claim on the basis of his failure to object. However, petitioner's argument, and recitation of Supreme Court precedent, do not tell the entire tale.

In *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the Supreme Court held that the adequate and

independent state ground doctrine applies on federal habeas review. In *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), the Court made clear that the "plain statement" rule, previously set forth in *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), equally applies in the context of habeas review. The *Harris* opinion explained the need for the plain statement rule:

> The question whether a state court's reference to state law constitutes an adequate and independent state ground for its judgment may be rendered difficult by ambiguity in the state court's opinion.... Under *Long,* if "it fairly appears that the state court rested its decision primarily on federal law," this Court may reach the federal question on review unless the state court's opinion contains a "plain statement" that [its] decision rests upon adequate and independent state grounds."

489 U.S. at 261, 109 S.Ct. at 1042 (citations omitted).

*Harris,* however, is not the final statement concerning the application of the adequate and independent state ground doctrine as it applies to habeas review. In *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), the Supreme Court explained that the plain statement rule is not as broad as petitioner would like to believe. The *Thompson* decision states that the plain statement rule is not per se applied in every case:

> The presumption [i.e., no adequate and independent state grounds absent a plain statement] at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision. In the rest of the cases, there is little need for a conclusive presumption. In the absence of a clear indication that a state court rested its decision

on federal law, a federal court's task will not be difficult.

*Id.* at 739–40, 111 S.Ct. at 2559–60.

*Thompson* dispels petitioner's argument that, absent a plain statement concerning a finding of procedural default by the state courts, this court must address the merits of his *Doyle* claim. As the *Thompson* Court stated, placing the burden on state courts to supply magic words for the benefit of federal review would undermine the purpose of the adequate and independent state ground doctrine. 501 U.S. at 738–39, 111 S.Ct. at 2559.[8] Comity and federalism, the underpinnings of the doctrine, are best served by giving proper respect to state court decisions when conducting federal habeas proceedings:

> It is not necessarily the case that state courts will take pains to provide a clear and express statement of procedural default in all cases, even after announcement of the rule. State courts presumably have a dignitary interest in seeing that their state law decisions are not ignored by a federal habeas court, but most of the price paid for federal review of state prisoner claims is paid by the State. When a federal habeas court considers the federal claims of a prisoner in state custody for independent and adequate state law reasons, it is the State that must respond. It is the State that pays the price in terms of the uncertainty and delay added to the enforcement of its criminal laws. It is the State that must retry the petitioner if the federal courts reverse his conviction. If a state court, in the course of disposing of cases on its overcrowded docket, neglects to provide a clear and express statement of procedural default, or is insufficiently motivated to do so, there is little the State can do about it. Yet it is primarily respect for the State's interests that underlies the application of the independent and adequate state ground doctrine in federal habeas.

*Id.*

8. Additionally, the *Thompson* Court points out the absurd result such a stringent standard would produce: "Once state courts know that their decisions resting on independent and adequate state procedural grounds will be honored

in federal habeas only if there is a clear and express statement of the default, these courts will provide such a statement in all relevant cases." 501 U.S. at 738, 111 S.Ct. at 2558.

In the instant case, no state court opinion has explicitly discussed petitioner's *Doyle* claim. On direct appeal, the West Virginia Supreme Court of Appeals found no merit in this assignment of error and summarily rejected it. *State v. Daniel*, 182 W.Va. 643, 391 S.E.2d 90, 93 (1990). The Supreme Court of Appeals again found no merit to this ground and again declined to discuss it in the appeal from the denial of habeas corpus relief by the Circuit Court of Raleigh County. *Daniel v. Legursky*, 195 W.Va. 314, 465 S.E.2d 416, 420 (1995).

As previously discussed, West Virginia has a longstanding commitment to the principle that a litigant must timely object to preserve a point for appeal. *See, e.g., Meadows v. Legursky*, 904 F.2d 903 (4th Cir.1990); *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). As the *Meadows* court noted, West Virginia applies the contemporaneous objection policy consistently. 904 F.2d at 907. Just this past year, the Supreme Court of Appeals of West Virginia reaffirmed its commitment to the contemporaneous objection rule in *State v. Miller*, 197 W.Va. 588, 476 S.E.2d 535 (1996). "Indeed, if any principle is settled in this jurisdiction, it is that, absent the most extraordinary circumstances, legal theories not raised properly in the lower court cannot be broached for the first time on appeal. We have invoked this principle with a near religious fervor." *Id.* 476 S.E.2d at 544.

In light of the short shrift the Supreme Court of Appeals gave Daniel's *Doyle* argument in its two opinions and the almost draconian manner in which that court has applied the contemporaneous objection rule, it seems probable that that court decided this issue against Daniel on the basis of his failure to object. Perhaps the most supportive evidence of this proposition, that the state courts denied the *Doyle* claim on state procedural grounds, is the state's appellate brief filed in the course of petitioner's direct appeal. That brief put squarely before the West Virginia Supreme Court the impact of petitioner's failure to object at trial on *Doyle* grounds. The state contested not only the merits of petitioner's claim, but also raised the issue of procedural bar:

> Even if such statement were interpreted as an invocation of the right to remain silent, the defendant failed to object and thus waived error, according to *State v. Acord*, 175 W.Va. 611, 336 S.E.2d 741, 745 (1985).

(Res. to Mot. for Rec., Ex. A., at 29.) This argument by the State, on direct appeal, that petitioner was procedurally barred from raising the *Doyle* claim confirms this court's belief that the state courts' dismissal of the claim was based on adequate and independent state grounds. Moreover, in light of the Supreme Court's decision in *Thompson*, plus the respondent's submission of the state's brief submitted during the direct appeal, it cannot be said with certainty that the state's dismissal of petitioner's *Doyle* claim "rested primarily on federal law or was interwoven with federal law." 501 U.S. 722, 739, 111 S.Ct. 2546, 2559, 115 L.Ed.2d 640. In fact, it is more likely that the Supreme Court of Appeals of West Virginia summarily rejected the claim because the petitioner had failed to preserve it.

This court is likewise unconvinced that petitioner's *Doyle* claim has merit which entitles him to habeas relief. As set out above, there are four specific instances which form the basis of petitioner's claim.

In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held that it violates the privilege against self-incrimination for a prosecutor to cross-examine a defendant about his failure to talk to police after receiving his *Miranda* warnings. *Doyle* has been the subject of many decisions, and it has undergone a great deal of refinement over the years. In fact, the Supreme Court has continually narrowed the application of *Doyle*, providing more and more guidance for prosecutors. In 1980, the Supreme Court utilized two cases to clarify the *Doyle* doctrine. In *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Court held that it was not violative of the Constitution to use a defendant's prearrest silence to impeach a criminal defendant's credibility. *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222

(1980), decided less than a week after *Jenkins,* ruled that *Doyle* did not apply in the context of questioning a defendant concerning prior inconsistent statements. "Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Id.* at 408, 100 S.Ct. at 2182. *See also Hockenbury v. Sowders,* 718 F.2d 155, 159 (6th Cir.1983) (rationale for exclusion of testimony concerning post arrest silence is inapplicable where arrestee speaks voluntarily after receiving *Miranda* warnings; such arrestee has not been induced to remain silent about subject matter of his statements).

Applying the current applicable principles to petitioner's claim, the court is convinced that there was no *Doyle* violation committed during trial. Unlike the majority of cases in which *Doyle* claims have been sustained, petitioner did not remain silent after receiving *Miranda* warnings.[9] In fact, petitioner was read his rights twice, and conversed with the police after each reading. (Resp. Ex. 8A, at 11.) Petitioner, therefore, did not take advantage of his rights. Having answered questions and discussed specifics after receiving *Miranda* warnings, petitioner opened the door to trial commentary concerning the circumstances of the postarrest conversation. The *Anderson* case supports this conclusion. 447 U.S. at 408, 100 S.Ct. at 2182.[10] *See also Hockenbury,* 718 F.2d at 159; *Saulsbury v. Greer,* 702 F.2d 651 (7th Cir.1983); *United States v. Ochoa–Sanchez,* 676 F.2d 1283, 1286 (9th Cir.1982); *Grieco v. Hall,* 641 F.2d 1029, 1034 (1st Cir.1981).

The record establishes that the comments made, and the cross-examination of Daniel, were in regard to statements offered by him at the time of his arrest. Since Daniel spoke with the authorities after receiving his *Miranda* rights, the prosecutor was permitted to relate the circumstances surrounding his comments, and to cross-examine him with regard to any inconsistent statements offered at trial. Thus, the court finds no merit to petitioner's *Doyle* claim.

■ Moreover, even if we assume that Daniel has stated a viable *Doyle* claim, he must persuade the court that he is entitled to the extraordinary relief afforded by habeas corpus review. Like the substantive principles governing *Doyle* claims, the standard of review employed to determine whether a defendant is entitled to relief based on a *Doyle* violation has also evolved. From its inception, courts reviewed *Doyle* claims, whether raised on direct appeal or in a collateral attack, under the "harmless beyond a reasonable doubt" standard announced in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See, e.g., Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). In *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court determined that the *Chapman* harmless error standard did not apply to *Doyle* claims raised in habeas proceedings. Instead, the court reasoned that the more deferential standard announced in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), was appropriate for federal habeas review:

> Overturning final and presumptively correct convictions on collateral review because the State cannot prove that an error is harmless under *Chapman* undermines

---

**9.** For cases sustaining *Doyle* claims, in which defendants maintained their silence, see *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986); *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983); *Williams v. Zahradnick,* 632 F.2d 353 (4th Cir.1980).

**10.** In *Anderson,* the defendant was questioned not only about prior inconsistent statements, but also with regard to his failure to tell the arresting officers anything with regard to an alibi raised for the first time at trial. The Supreme Court

found that the two aspects of questioning could not be bifurcated and found that

> [t]he questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement.

Each of two inconsistent descriptions of events may be said to involve "silence" insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of "silence," and we find no reason to adopt such a view in this case.

447 U.S. at 409, 100 S.Ct. at 2182–83.

the States' interest in finality and infringes upon their sovereignty over criminal matters. Moreover, granting habeas relief merely because there is a " 'reasonable possibility' " that trial error contributed to the verdict, is at odds with the historic meaning of habeas corpus—to afford relief to those whom society has "grievously wronged." Retrying defendants whose convictions are set aside also imposes significant "social costs," including the expenditure of additional time and resources for all the parties involved, the "erosion of memory" and "dispersion of witnesses" that accompany the passage of time and make obtaining convictions on retrial more difficult, and the frustration of "society's interest in the prompt administration of justice."

. . . .

The imbalance of the costs and benefits of applying the *Chapman* harmless-error standard on collateral review counsels in favor of applying a less onerous standard on habeas review of constitutional error. The *Kotteakos* standard, we believe, fills the bill. The test under *Kotteakos* is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice."

507 U.S. at 637, 113 S.Ct. at 1722 (citations omitted).

The United States Court of Appeals for the Fourth Circuit has recently had the opportunity to apply the new standard established in *Brecht*. *Cooper v. Taylor*, 70 F.3d 1454 (4th Cir.1995), *vacated on reh'g en banc*, 103 F.3d 366, (4th Cir.1996). On appeal, a panel of the Fourth Circuit, in a divided opinion, held that the defendant was entitled to habeas relief because it was "impossible to conclude with any fair assurance" that the constitutional violation did not have a " 'substantial and injurious effect or influence' on the jury's verdict." 70 F.3d at 1456. On rehearing, the full court changed the panel's decision. Writing for the full court, Judge

Niemeyer exalted the principles set forth in Brecht, and emphasized that habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.' " 103 F.3d at 371 (quoting *Brecht*, 507 U.S. at 637, 113 S.Ct. at 1722 (citations omitted)). The second opinion in *Cooper* noted that the burden is on the petitioner to establish actual prejudice. 103 F.3d at 371.

Here, petitioner has offered no argument that he has suffered actual prejudice as a result of what he perceives to be *Doyle* violations. Moreover, the record refutes any possible finding of actual prejudice. This was not a case in which the defendant contested the act of the crime; petitioner stipulated that he did indeed shoot the victims. (Resp. Ex. 8A, at 6.) Petitioner's trial defense was "self defense or accidental shooting defense." *Id.*

At the time of his arrest, petitioner responded to questioning by the police concerning the shooting by stating "man, this was self defense, I was afraid for my life." (Resp. Ex. 8A, at 400.) During the trial, petitioner stated on direct examination that after being told by the police that there was a shooting, he simply responded by saying "he [Detective Bolen] asked me did I want to make a statement at that time and I told him no, I didn't have ... the only thing I had to say was I wanted to see an attorney...." (*Id.* at 497.) Petitioner's trial testimony, and the pretrial comment that accidental shooting would be a defense, opened the door to inquiry surrounding petitioner's post-arrest statement that he acted in self-defense.

The prosecutor's comments and questions surrounding the circumstances of petitioner's statements to the police, after he had received *Miranda* warnings, were relevant to impeaching defendant's trial testimony that the shooting was accidental. Furthermore, petitioner's defense, in light of the evidence presented at trial, was not likely to persuade the jury. Comments concerning petitioner's request for a lawyer, after already stating he acted in self-defense, can hardly be said to have had any conceivable impact on the jury verdict. Petitioner made a voluntary postarrest statement, then changed his story on the

stand. This alone served to undermine his defense. It is outside the realm of reality to find, if indeed there was a *Doyle* violation, that four discreet comments resulted in "actual prejudice" under the Brecht standard. Petitioner has failed to persuade the court otherwise and, accordingly, the court cannot find any actual prejudice stemming from these four specific instances.[11]

For all of these reasons, the court concludes that petitioner's *Doyle* claim is without merit, declines to accept the Magistrate Judge's recommendation, and sustains respondent's objections to the Magistrate Judge's findings and recommendation on this point.

### C. Jury Instructions

■ Petitioner complains that State's Instruction No. 1, (Resp. Ex. 8B, at 615–16), impermissibly and unconstitutionally shifted the burden of proof to the petitioner. The instruction as given to the jury was as follows:

The Court instructs the jury that the defendant, Ronald Gene Daniel, stands charged in Count I of the Indictment with first degree murder.

Malice is a subjective state of mind in the defendant. It may be proven by evidence of circumstances surrounding the crime, such as words or conduct of the defendant, or evidence of ill-will or a source of antagonism between the defendant and the deceased. Further, malice may be inferred by the intentional use of a deadly weapon. Also, it may be inferred from a deliberate cruel act against another, indicating a heart disregarding social duty, fatally bent on mischief.

To prove premeditation it is not necessary that the intention to kill existed for any length of time prior to the killing; it is only necessary that such intention should spring into the mind of the accused at the instant of such killing or any time prior thereto.

"Deliberation" means that the killing is deliberate: deliberation like malice, may be inferred when a deadly weapon is used.

Therefore, if you find from the evidence beyond a reasonable doubt that this defendant, Ronald Gene Daniel, intentionally, maliciously, deliberately and with premeditation shot and killed Walter Dale Morgan, then you may find the defendant guilty of first degree murder as charged in Count I of the Indictment.

(*Id.*)

In her conclusion that the challenged instruction impermissibly shifted the burden of proof, the Magistrate Judge relied on *State v. Jenkins,* 191 W.Va. 87, 443 S.E.2d 244 (1994), a decision of the West Virginia Supreme Court of Appeals which fell in point of time between that court's two opportunities to consider Daniel's case and the specific instruction at issue here. Thus, the West Virginia high court had the opportunity to reconsider the challenged instruction in light of its own decision in Jenkins and found no error. *See Daniel v. Legursky,* 195 W.Va. 314, 465 S.E.2d 416, 420 (1995). The Magistrate Judge's conclusion, based on *Jenkins,* is therefore sharply at odds with the West Virginia court's own interpretation of *Jenkins.*

■ Before a federal court may overturn a state conviction based upon an erroneous instruction, it must pass over a very high threshold; that threshold requires, not merely that the instruction be "undesirable, erroneous, or even 'universally condemned,'" but that it violates a right guaranteed by the Fourteenth Amendment. *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). In *Cooper v. North Carolina,* 702 F.2d 481, 483 (4th Cir.1983), our Court of Appeals held that the question on collateral review is whether the challenged instruction by itself so infected the entire trial that the conviction violated due process. Viewing the instruction at issue here in context with the instructions given by the trial court as a whole, and affording due

---

**11.** It is worth noting that petitioner's trial counsel did not object on *Doyle* grounds, likely because he realized the voluntary statement concerning self-defense was admissible. if petitioner had not changed stories, opening the door to his postarrest statements, *Doyle* would likely not even be an issue.

deference to the Supreme Court of Appeals of West Virginia which has found this instruction to be permissible, this court is unable to conclude that Daniel's constitutional rights have been violated. The court has been cited to no federal authority which compels a different result. In the absence of some federal authority indicating that the United States Constitution has been violated, this court chooses to accept the West Virginia Supreme Court's construction of the specific instruction at issue here.

The court therefore declines to accept the Magistrate Judge's recommendation on the jury instruction point, and sustains the respondent's objection thereto.

### D. Petitioner's Objection That His Counsel's Conduct At Trial Was Not Objectively Reasonable

Daniel has objected to the Magistrate Judge's finding that his trial attorney's performance was objectively reasonable in his development of a theory of defense, in his failure to emphasize the helpful aspects of Jimmy Torrence's testimony at trial, and in his failure to call Carol Dotson Brammer as a witness at trial. The court agrees with the conclusion of the Magistrate Judge on these points. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court developed a two-prong analysis for claims of ineffective assistance of counsel—the first element is competence, the second prejudice.

■ On the issue of competence, there is a strong presumption that the attorney's actions are reasonable, and a reviewing court must be widely deferential in scrutinizing the performance of counsel. *Id.* The reasons for this rule are obvious: there may be legitimate strategic considerations for counsel's decisions which appear in retrospect to be made in violation of evidentiary principles or other rules. A reviewing court, with only the sterile written record before it, is not in a position to second-guess these strategic decisions after-the-fact.

The second element of *Strickland* is equally difficult to satisfy. To show prejudice, the defendant must demonstrate that, but for counsel's unprofessional errors, there is a reasonable probability the outcome would have been different. *Id.* at 697, 104 S.Ct. at 2069–70.

The Magistrate Judge has carefully analyzed the facts of this case and counsel's decisions and actions under the *Strickland* rules and concluded that such actions and decisions were not objectively unreasonable. (F & R, at 9–13). This court has conducted a careful *de novo* review of the record and concludes that the analysis of the Magistrate Judge on this ground is correct.

### E. The Impact of Cumulative Error and the Plain Error Doctrine

■ Both the Magistrate Judge and the Supreme Court of Appeals of West Virginia were legitimately troubled by this case. The Magistrate Judge found the grounds for relief, individually and cumulatively, to be "constitutional errors of significant magnitude." (F & R, at 54). The Supreme Court of Appeals deemed it "a very close case on the merits" and doubted whether it was a legitimate case of first degree murder. *Daniel v. Legursky*, 465 S.E.2d at 423. Discharge of a convicted felon through habeas corpus is not to be, however, an act of judicial clemency. *Evans v. Muncy*, 916 F.2d 163, 167 (4th Cir.) *cert. denied*, 498 U.S. 927, 111 S.Ct. 309, 112 L.Ed.2d 295 (1990).

■ Similarly, attorney errors short of constitutional ineffectiveness do not constitute cause for issuance of the writ. This principle has been held to apply whether the errors arise from inadvertence, ignorance or strategic choice. *Murray v. Carrier*, 477 U.S. 478, 487–88, 106 S.Ct. 2639, 2644–46, 91 L.Ed.2d 397 (1986). While several points were not preserved through counsel's failure to object, this court is not prepared to conclude that those failures, even when considered cumulatively, rise to the level of ineffective assistance in the constitutional sense. Attorneys often have reasons dictated by strategic considerations to refrain from objecting. It is not inconceivable, for example, that counsel at the state habeas hearing wanted Dillon to answer those questions which could have been excluded under Rule 606(b). Perhaps he expected her to say, or hoped she would say, that Kelly's calls had in

fact impaired her ability to decide Daniel's case objectively. A proceeding for extraordinary relief should not become an occasion for the reviewing court to "sharp-shoot" the tactical decisions of counsel.

The plain error doctrine sometimes saves a criminal defendant from the adverse impact of his attorney's failures to object. However that doctrine is an elusive one, rarely resorted to, and must of necessity be applied in a fact-specific manner. It is generally held that, for the plain error doctrine to operate in a given case, the error must be so egregious that the judge and prosecutor are derelict in countenancing it. *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). We do not have that here. Accordingly, while this case may be troubling, the rules and standards by which this court must be governed do not permit it to grant the relief petitioner seeks.

### III. *Conclusion*

For all of these reasons the court concludes that petitioner's claims lack merit and the writ of habeas corpus should not issue. Petitioner's motion for reconsideration, viewed as a motion to alter or amend a judgment pursuant to Rule 59(e) will be denied, and this court's Judgment Order of March 31, 1997, denying the writ of habeas corpus will stand.